DELMAR FULK, Plaintiff-Appellee, v. WAYNE ROBERTS *et al.*, Defendants-Appellants.

Fifth District   No. 5—86—0596

Opinion filed November 9, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, and Michael Vujovich, Assistant Attorney General, of Springfield, of counsel), for appellants.

Jerry B. Smith, of Hohlt, House, DeMoss & Johnson, of DuQuoin, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Plaintiff, Delmar Fulk, filed a two-count complaint in the circuit court of Perry County seeking compensatory and punitive damages for an alleged violation of his constitutional rights. Count I of the complaint purported to be at common law on a theory of unlawful detention. Count II was brought pursuant to 42 U.S.C. §1983 (1982). In both counts, plaintiff claimed defendants, Wayne Roberts and Michael O'Neill, acting in their capacity as game wardens, unlawfully detained him and, as a result, he suffered humiliation and emotional distress as well as harm to his reputation in the community.

In answer, defendants denied, *inter alia*, that they unlawfully de-

tained plaintiff or that he was damaged as a result of the detention. Defendants raised good faith and immunity as affirmative defenses to the action.

On April 19, 1984, defendants filed a motion for summary judgment alleging that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law. In their motion, defendants stated, "the only genuine issue of material fact to be decided is whether Defendants had probable cause to detain the Plaintiff." On July 6, 1984, the trial court entered an order granting defendants' motion for summary judgment and finding that probable cause existed to investigate whether plaintiff was violating a provision of the Wildlife Code of 1971 (Ill. Rev. Stat. 1983, ch. 61, par. 1.1 *et seq.*).

Plaintiff filed notice of appeal on November 9, 1984. Subsequently, the parties joined in a motion to vacate summary judgment and to remand the cause for further proceedings. On June 17, 1985, we granted the motion and remanded the cause to the circuit court.

A bench trial was conducted on May 16, 1986. The testimony at trial was as follows.

Plaintiff, Delmar Fulk, an employee of Freeman United Coal Company, testified that on November 25, 1983, he was on his way to work. En route to the mine, he drove his truck in on the main road, referred to as Green Market Road, passed through a gate identifying the mine property as a restricted area, and drove at most another quarter of a mile to Number Two Lateral Road. Before turning onto Number Two Lateral Road, Fulk turned on his spotlight, which was mounted on his vehicle. He said he activated the spotlight for two reasons. First, he saw lights down the road which he assumed was the foreman and he used his spotlight to signal him. Second, he had to locate the drill machine and high wall area which moved continuously as the mining process progressed. Fulk left the spotlight on, shining it back and forth, as he drove toward his worksite. When he reached the worksite, Fulk backed in to turn around and noticed a vehicle approaching with its high beams on. It stopped in front of Fulk's truck.

Fulk testified that two conservation officers, the defendants, emerged from the vehicle. He thought they were checking because there had been deer poachers in the vicinity. The officers approached Fulk and asked him what he was doing shining the spotlight. Fulk explained that he used the light because he worked on the drill at the mine site. Fulk testified that the officers then ordered him out of his vehicle and he swore at them after they "got smart." Officer Roberts checked the cab of Fulk's truck for guns while Officer O'Neill examined Fulk's

driver's license. After the officers were satisfied that Fulk did not have a gun, they returned his license and drove away.

Fulk testified that the incident had not affected his relationship with his family other than making him irritable. He had also been subjected to good-natured ribbing by members of the community.

Rod Rummler, an employee of Freeman United, testified that the area where Fulk was stopped had been stripped of top soil and vegetation. The stripped area varied in size, but was approximately half a mile in width to two miles in length. Rummler said he had never seen wildlife in the high wall area, but admitted that it could be present and he not know of it. Rummler testified that there were wooded areas and farmland 200 or 300 feet from the spot where Fulk was stopped. He said the Department of Conservation is authorized to patrol Freeman's inactive mining areas.

Conservation Sergeant Monte Burnham testified that November 25, 1983, was the opening day of hunting season for furbearing animals. The Conservation Department's personnel in the Perry County area were particularly alert for "shining" activities, whereby hunters illegally use a spotlight to transfix game, making it easier to shoot. The Department was using aerial surveillance to locate shining activities and had transferred Officers Roberts and O'Neill from another district to help locate potential violators on the ground.

Burnham was familiar with Freeman United property in Perry County because Freeman personnel had requested that the Department patrol company property and had reported numerous incidents of poaching on Freeman's property. Burnham said he and other officers had issued citations for wildlife infractions on Freeman property, some involving Freeman employees.

Defendants, conservation officers Wayne Roberts and Michael O'Neill, testified that they were working in Perry County on November 25, 1983, and were in communication with an airplane in a concerted departmental effort to curtail shining activities. Neither officer was familiar with the area. Prior to stopping Fulk, the officers had issued a ticket to Dennis Hottes on the main east-west road which Fulk mentioned in his testimony. Hottes had also been shining a light from his vehicle and had been in possession of a loaded firearm when stopped. The officers had just finished with Hottes when they observed Fulk's vehicle turn off the main gravel road and a spotlight come on. Fulk had gone about 200 yards up the aforementioned side road when the officers started after him, activating their red lights.

The officers entered the mining area from the east, traveling on the main gravel road. The terrain was flat to rolling, a strip mine area

with sparse vegetation. The officers said they would have expected certain types of wildlife to be found there. Roberts and O'Neill followed Fulk for approximately three minutes. Fulk was shining his light to the left of his vehicle and ahead of it.

Eventually Fulk stopped and turned around. The officers did not know what he was doing so they stopped in the roadway. Fulk pulled up very close to their vehicle and stopped his truck. The officers then conducted a brief investigation and, after they were satisfied Fulk was not in violation of the Wildlife Code, they left.

Michael Carter, wildlife biologist for the Department of Conservation, testified that he monitors game populations and habitat and had analyzed game populations in Perry County on two separate occasions. Carter was familiar with the area where Fulk was stopped. It is an unusual area because it contains previously mined areas, private cropland and pieces of bottomland timber. The location where Fulk was stopped could contain any of the native species: raccoon, coyote, mink, weasel or deer. The high wall, actively mined area, while sparse in vegetation, is in close proximity to all other habitat components, which makes the likelihood of wildlife in that area very high.

Based upon the foregoing testimony, the trial court held that (1) there were no reasonable grounds to detain plaintiff; (2) defendants acted carelessly and with willful and wanton negligence in doing so; (3) as a result plaintiff suffered humiliation and mental distress and harm to his reputation in the community; and (4) the conduct of defendants was malicious and deprived him of his constitutional rights in violation of 42 U.S.C. §1983 (1982). The court awarded damages in the amount of $500, plus costs. Defendants appealed.

On appeal, defendants contend, as they did in the trial court, that they had, at least, sufficient cause to conduct a brief investigatory stop in order to confirm or allay their suspicions that plaintiff was using his spotlight illegally to violate the Wildlife Code. We agree.

■■ Conservation officers have the same powers to detain, search and arrest as other law enforcement officers. (Ill. Rev. Stat. 1985, ch. 61, pars. 1.14, 1.15, 1.19.) Therefore, conservation officers may stop and temporarily detain a person for the purpose of a limited investigation, absent probable cause to arrest him, if the officers are able to point to specific and articulable facts which, taken together with reasonable inferences drawn from the officers' experience, would reasonably warrant the extent of the intrusion. See *People v. Beil* (1982), 110 Ill. App. 3d 291, 442 N.E.2d 291, *cert. denied* (1983), 464 U.S. 824, 78 L. Ed. 2d 100, 104 S. Ct. 93.

Facts known to the officers and reasonable inferences from those

facts warranted, at least, an investigatory stop. November 25 was the first day of hunting season; therefore, a high volume of hunters could be expected on that day. The officers were assigned to the area they were working because the Conservation Department expected activity in that area. The defendants, based on their experience as conservation officers, believed that wildlife would be present. This belief would appear to be reasonable in view of plaintiff's admission that poaching was common on mine property and Michael Carter's testimony that the likelihood of wildlife, even in the stripped high wall area, was "very high." Most important in the officers' decision to detain plaintiff was plaintiff's use of the spotlight. The officers saw plaintiff shining his spotlight with a sweeping motion. Being relatively unfamiliar with the specific location they were patrolling, they were unaware that they were so close to active mining operations. They drew the conclusion any reasonable person might have drawn under the circumstances—plaintiff was using his spotlight to locate game. Even after plaintiff explained his use of the spotlight, the officers acted reasonably in verifying his story by checking for firearms.

Section 2.33(i) of the Wildlife Code (Ill. Rev. Stat. 1983, ch. 61, par. 2.33(i)) provides:

> "(i) It is unlawful to take, pursue or intentionally harass or disturb in any manner any wild birds or mammals by use or aid of any automobile, vehicle, or conveyance, any type of watercraft or aircraft, any kind of machine propelled by mechanical power, or by the use of the lights thereof or any light used from such vehicle or watercraft while in the possession of a gun or bow and arrow, except in protection of livestock from predatory animals and except that striped skunk, opossum, red fox, gray fox, raccoon and coyote may be taken during the open season by use of a small light which is worn on the body or hand-held by a person on foot and not in any vehicle."

Plaintiff was driving in an area where game might have been present and he was sweeping his spotlight over the surrounding terrain. His conduct might well have led a reasonable person to believe he was violating the statute. It is of no consequence that plaintiff was not in fact violating the law if there was a basis for believing he was. See *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.

■ We hold that the defendants' actions in detaining plaintiff and looking inside his vehicle for firearms were proper. Defendants were aware of specific and articulable facts to justify the investigatory stop; therefore, plaintiff was not unlawfully detained. The existence of cause for any detention by a peace officer is an absolute bar to a claim for

200

damages. (*Williams v. Kobel* (7th Cir. 1986), 789 F.2d 463, 470.) The trial court's holding is contrary to the manifest weight of evidence.

Given our finding of reasonable cause to detain and our reversal of the trial court, we need not address defendants' remaining issues at length; however, we will briefly treat both.

█ Defendants contend on appeal that qualified immunity bars an action against them as private individuals. We agree. Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. (*Mitchell v. Forsyth* (1985), 472 U.S. 511, 86 L. Ed. 2d 411, 105 S. Ct. 2806; *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727; *Bier v. Fleming* (6th Cir. 1983), 717 F.2d 308, *cert. denied* (1984), 465 U.S. 1026, 79 L. Ed. 2d 686, 104 S. Ct. 1283.) As the defendants acted in good faith, qualified immunity barred this action for damages against defendants as private individuals.

█ Defendants' final argument challenges the $500 compensatory damage award ordered by the trial court. The evidence at trial on the issue of damages consisted entirely of plaintiff's testimony. Said testimony does not support the allegations in his complaint of humiliation, emotional injury and harm to his reputation in the community. Plaintiff admitted at trial that he was subjected merely to "good-natured ribbing" and was sometimes "irritable" around his family as a result of the incident. While emotional injury is actionable under 42 U.S.C. §1983 (1982) for humiliation, embarrassment and mental distress resulting from deprivation of constitutional rights (*H.C. v. Jarrard* (11th Cir. 1986), 786 F.2d 1080), plaintiff's testimony is insufficient to sustain a damage award. Good-natured kidding does not equate with humiliation. Moreover, it is difficult to see how plaintiff's reputation in the community could have been affected, even assuming *arguendo* a recovery for damage to reputation would have been proper (see *Paul v. Davis* (1976), 424 U.S. 693, 701, 47 L. Ed. 2d 405, 414, 96 S. Ct. 1155, 1160-61), since plaintiff did nothing wrong, nor was he actually accused of wrongdoing by defendants or anyone else. In sum, plaintiff suffered no injury.

For the reasons stated, the judgment of the circuit court of Perry County is reversed.

Reversed.

WELCH and HARRISON, JJ., concur.