THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TIM R. LAYTON, Defendant-Appellant.

Fourth District   No. 4—89—0495

Opinion filed March 29, 1990.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and J.A.C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

After a bench trial, defendant was convicted of the offense of unlawful possession of more than 30 and less than 500 grams of a substance containing cannabis (Ill. Rev. Stat. 1987, ch. 56½, par. 704(d)), and was sentenced to a term of two years' probation. Defendant appeals, arguing the trial court erred in denying his motion to suppress the evidence, which was discovered by a conservation officer in a warrantless search of an opaque bag in the cab of defendant's truck on the first day of hunting season.

The facts were these. On November 8, 1986, the first weekend of upland game hunting season, conservation officer Timothy Sickmeyer was in the area of a railroad viaduct near the intersections of Vermilion County Road 4200 North in the area of County Road 670 East and 570 East at about 10:30 a.m. He observed quite a few hunters who had returned or were returning to the vicinity of their vehicles. As the hunters appeared to be quitting, Sickmeyer pulled up to check the hunters and the vehicles for possible violations of the Wildlife Code (Code) (Ill. Rev. Stat. 1987, ch. 61, par. 1.1 et seq.), i.e., checking hunting licenses, type of weapon, type of shot used and carried, game harvested and carried in game bags or oversized clothing and, in vehicles, areas or containers which might contain illegal game. Defendant was in the last group of these hunters Sickmeyer checked, and was standing at the back of his truck with his dogs. After checking defendant and the back of his truck, Sickmeyer proceeded to look inside the crew-type cab. Behind the driver and passenger seats were two smaller seats containing luggage, clothing, and other items, including an opaque plastic bag of a size which might contain illegal game. Sickmeyer testified that, based on experience, hunters often separate illegally taken game into such bags, held apart from legally taken game. On looking inside the bag, Sickmeyer discovered a green, leafy substance which appeared to be cannabis. On lifting this bag, Sickmeyer discovered four clear, Ziploc-style bags which also appeared to contain cannabis. Sickmeyer then noticed a gram scale located on the console of the truck. Defendant was arrested and the contraband was seized. At bench trial it was disclosed that when Sickmeyer

turned and asked defendant about the bag containing what appeared to be cannabis, defendant said he found it on the tollway. Further, cigarette rolling papers were found on the console along with the gram scale. The substance, weighing 393.5 grams, tested positive for cannabis. Defendant presented no evidence.

Prior to trial, defendant filed a motion to suppress, arguing that (1) at the time of defendant's detention and subsequent arrest, there was no outstanding warrant for defendant and the conservation officer had no probable cause to believe (a) defendant had committed or was about to commit a criminal offense, or (b) any warrant for his arrest was outstanding; and (2) subsequent to his detention, the arresting officer, without probable cause and without a warrant, illegally obtained evidence by conducting an intrusive search of defendant's motor vehicle, all in violation of defendant's rights under the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution and under article I, sections 2, 6, and 10, of the Illinois Constitution of 1970. After hearing, this motion was denied. The motion was renewed at bench trial and again denied, whereupon defendant was convicted. No post-trial motion was filed. See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

The State contends that the warrantless search of the opaque plastic bag was conducted pursuant to section 1.19 of the Code, which provides:

"All authorized employees of the Department are empowered, pursuant to law, to enter all lands and waters to enforce the provisions of this Act. Authorized employees are further empowered to examine all buildings, private or public clubs (except dwellings) *** camps, vessels, cars (except sealed railroad cars or other sealed common carrier), conveyances, *vehicles*, watercraft or other means of transportation or shipping whatsoever, tents, *game bags, game coats or other receptacles*, and to open and examine any box, barrel, package, or other receptacle in the possession of a common carrier, *which they have reason to believe contains wild birds or any part thereof *** or wild mammals *** taken, destroyed, bought, sold or bartered, shipped or held in possession contrary to any of the provisions of this Act, including administrative rules ***.

All authorized employees of the Department shall be given free access to and shall not be hindered or interfered with in making such examination ***.

Authorized law enforcement employees of the Department

are empowered to conduct examination of equipment and devices in the field, pursuant to law, to ensure compliance with the provisions of this Act." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 61, par. 1.19.)

Defendant does not challenge the constitutionality of section 1.19 of the Code, but contends the statute's "reason to believe" requirement was not met here. Defendant argues that a conservation officer cannot detain a hunter in the field and search receptacles in his vehicle which might contain illegal game *unless* the officer has probable cause or reason to believe that, in fact, this particular hunter has violated the Code. The trial court disagreed and upheld the search, which it characterized as administrative, citing *Fulk v. Roberts* (1987), 164 Ill. App. 3d 194, 517 N.E.2d 1098, *Illinois v. Krull* (1987), 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160, and *People v. Mashaney* (1987), 160 Ill. App. 3d 390, 513 N.E.2d 615.

In *Fulk*, the fifth district reversed a damages award on a two-count complaint alleging unlawful detention and a section 1983 action (42 U.S.C. §1983 (1982)). Plaintiff alleged that named defendants, game wardens, unlawfully detained him and, as a result, he suffered humiliation and emotional distress as well as harm to his reputation in the community. The conservation officers were in communication with an airplane in a concerted departmental effort to curtail "shining" activities, whereby hunters illegally used a spotlight to transfix game, making it easier to shoot. Prior to stopping Fulk, the officers had issued a ticket to another man, who was shining a light from his vehicle and was in possession of a loaded firearm when stopped. As the officers finished with that man, they observed Fulk's vehicle turn off the main gravel road and a spotlight come on. The officers started after him, activating their red lights, and Fulk stopped and turned around. The officers did not know what Fulk was doing, so they stopped in the roadway and Fulk pulled up close to their vehicle and stopped his truck. The officers then conducted a brief investigation wherein, according to Fulk, the officers ordered him out of his vehicle and checked the cab of the truck for guns. Fulk's explanation for the use of the spotlight was that it was in connection with his work on a drill at a mining site in the area. After the officers were satisfied Fulk was not in violation of the Code, they left. In reversing the judgment, the fifth district stated:

"Conservation officers have the same powers to detain, search and arrest as other law enforcement officers. (Ill. Rev. Stat. 1985, ch. 61, pars. 1.14, 1.15, 1.19.) Therefore, conservation officers may stop and temporarily detain a person for the

purpose of a limited investigation, absent probable cause to arrest him, if the officers are able to point to specific and articulable facts which, taken together with reasonable inferences drawn from the officers' experience, would reasonably warrant the extent of the intrusion. See *People v. Beil* (1982), 110 Ill. App. 3d 291, 442 N.E.2d 291, *cert. denied* (1983), 464 U.S. 824, 78 L. Ed. 2d 100, 104 S. Ct. 93." *Fulk*, 164 Ill. App. 3d at 198, 517 N.E.2d at 1100-01.

In *Krull*, the Supreme Court ruled that the fourth amendment exclusionary rule did not apply to evidence obtained by a police officer, acting in objectively reasonable reliance on a statute authorizing warrantless inspection of records of the sale of motor vehicles and vehicular parts, and requiring licensees to allow examination of the premises of their place of business for determining the accuracy of these records. This ruling reversed a decision of the Illinois Supreme Court suppressing the evidence. (*People v. Krull* (1985), 107 Ill. 2d 107, 481 N.E.2d 703.) The statute in question had been held unconstitutional by a Federal district court ruling issued the day following the search. *Krull*, 480 U.S. at 344, 94 L. Ed. 2d at 371, 107 S. Ct. at 1164.

In *Mashaney*, the third district affirmed the trial court's denial of a motion to quash a search warrant and suppress evidence. There, a police officer, acting on a tip, made an observation of marijuana being grown within a wooden stockade-type fence attached to defendant's residence. The officer, acting on the local police chief's representation that property beyond the fence was village property, entered a heavily wooded ditch beyond defendant's fences and used binoculars and a telephoto lense to observe and photograph the stockade-fence area, observing marijuana plants growing inside. Based upon this information, a judge issued a warrant, and the marijuana plants were seized from defendant's garden. Evidently the land the officer entered to obtain the photographs underlying the warrant was not public land. The *Mashaney* court found that police acted in objective good faith in observing defendant's property and that application of the exclusionary rule would not serve the rule's purpose of deterring malicious conduct, but would only force crime investigators to master the skills of precisely establishing land-ownership lines.

On appeal, defendant argues the trial court erroneously analogized to *Fulk*, *Krull*, and *Mashaney*, and to cases upheld following legitimate roadblock stops of motorists. Defendant maintains examination of the case law on vehicle stops at roadblocks, checkpoints, and by roving patrols leads to the "inescapable conclusion" that the search and seizure in this case violated the fourth amendment.

I

Defendant first looks to *Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391, wherein the Court held that a random stop and detention of a driver to check for a valid driver's license and vehicle registration violated the fourth amendment as an unreasonable seizure. Justice Blackmun concurred, joined by Justice Powell, stating:

"The Court *** carefully protects from the reach of its decision other less intrusive spot checks 'that do not involve the unconstrained exercise of discretion.' The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop. And I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

With this understanding, I join the Court's opinion and its judgment." (*Prouse*, 440 U.S. at 663-64, 59 L. Ed. 2d at 674, 99 S. Ct. at 1401 (Blackmun, J., concurring).)

Defendant maintains that the majority's silence on whether its holding extended to game wardens searching for game violations "means that the majority chose to make no such exception to its ruling." We disagree. *Prouse* had nothing to do with game wardens searching for game violations, and the *Prouse* majority was under no obligation to comment on facts not before it.

Defendant next looks to Supreme Court decisions on roving patrols, comparing the border patrol cases of *Almeida-Sanchez v. United States* (1973), 413 U.S. 266, 37 L. Ed. 2d 596, 93 S. Ct. 2535, *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574, and *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074. In *Almeida-Sanchez*, the petitioner was stopped by United States Border Patrol agents on a highway in California, some 25 air miles north of the border. This road lies, at all points, north of a major east-west highway entirely within the United States, and nowhere reaches the Mexican border. The Border Patrol had no search warrant and there was no probable cause of any kind for the stop or subsequent search—not even the "reasonable suspicion" found sufficient for a street detention and

weapon search in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, and *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921. The *Almeida-Sanchez* Court looked to the narrow exception to the warrant requirement first established in *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, wherein the Court approved a portion of a statute providing for warrantless searches of automobiles when there was probable cause to believe they contained illegal alcoholic beverages, and distinguished the warrantless administrative inspections of commercial enterprises engaged in businesses closely regulated and licensed by the government in *Colonnade Catering Corp. v. United States* (1970), 397 U.S. 72, 76-77, 25 L. Ed. 2d 60, 64, 90 S. Ct. 774, 777 (stressing long history of Federal regulation and taxation of manufacture and sale of liquor), and *United States v. Biswell* (1972), 406 U.S. 311, 312 n.1, 315-16, 32 L. Ed. 2d 87, 90 n.1, 92, 92 S. Ct. 1593, 1594 n.1, 1596 (noting pervasive system of regulation and reporting imposed on licensed gun dealers)—finding the underlying border patrol search more comparable to the warrantless administrative inspection disapproved in *Camara v. Municipal Court* (1967), 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727.

In *Brignoni-Ponce*, Border Patrol agents patrolling an area near the Mexican border, where a fixed checkpoint had been closed because of inclement weather, pursued respondent's car and stopped it, saying later their only reason for doing so was that its three occupants appeared to be of Mexican descent. The officers questioned respondent and his two passengers about their citizenship and learned the passengers were illegal aliens. All three were arrested, and respondent was convicted of two counts of knowingly transporting illegal immigrants. He appealed, arguing the fourth amendment prohibited the use of roving patrols to search vehicles without a warrant or probable cause. The government interpreted statutory provisions as granting authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe the occupants are aliens or that other aliens may be concealed in the vehicle. The Court held:

> "[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *Brignoni-Ponce*, 422 U.S. at

881, 45 L. Ed. 2d at 616-17, 95 S. Ct. at 2580.

In *Martinez-Fuerte,* the Court held the fourth amendment was not violated when Border Patrol agents stopped vehicles at a fixed checkpoint for brief questioning, even though there was no reason to believe the particular vehicle contained illegal aliens and, further, operation of such a checkpoint need not be authorized in advance by a judicial warrant.

Defendant also cites *People v. Bartley* (1985), 109 Ill. 2d 273, 486 N.E.2d 880, wherein the supreme court concluded roadblocks are not *per se* violative of the fourth amendment. There, a driver's license checkpoint was established. Defendant points to the fact that vehicles were stopped in a preestablished, systematic fashion, eliminating the potential for arbitrary enforcement, and that there was advance publicity. The *Bartley* court noted that the police there did not publicize the fact that the purpose of the roadblock was to detect and deter drunken drivers. *Bartley,* 109 Ill. 2d at 292, 486 N.E.2d at 888. See generally Annot., 37 A.L.R.4th 10 (1985) (validity of roadblock searches to discover vehicle or driving violations).

Defendant contends this case is instead comparable to that of *United States v. Munoz* (9th Cir. 1983), 701 F.2d 1293. There, a game trooper patrolling the national forest was conducting a roving patrol in a State police vehicle with a biologist from the State's Department of Fish and Wildlife. They were stopping all vehicles in the area to check for wood-cutting permits, to conduct a brief interview asking what park visitors had seen or done, and to check for possible game violations. They flagged down the defendant's truck, and thereafter saw cut wood in the back of the truck. The game trooper thereafter saw deer hair in the front of defendant's truck and that defendant's hands were covered with blood. He told the defendant to get the deer from under the wood in the back of the truck and, when defendant unloaded the wood and pulled out the doe, the game trooper saw bird tail feathers in the truck, which he recognized as those of a golden eagle. The Ninth Circuit held that roving vehicle stops without founded suspicion violate fourth amendment rights.

## II

We find *Munoz* is inapposite on its facts. The conservation officer here was not making random stops of citizens merely passing through the area. He was checking hunters.

Neither do we find the roadblock or checkpoint stop cases dispositive. The State cites *State v. Halverson* (S.D. 1979), 277 N.W.2d 723, wherein the supreme court of South Dakota held a game stop con-

ducted by a trooper stopping vehicles with the use of his red signal lights, in the presence of four other State-owned vehicles at the game check site, was not violative of the defendant's constitutional rights. Therefore, the officer, seeing an expired motor vehicle safety inspection sticker, then had probable cause for the further detention of defendant, which resulted in his arrest for offenses of driving under revocation. The *Halverson* court reasoned:

> "The game checkpoint stop of vehicles involved here was for the purpose of determining whether the occupants were in possession of any game animal. Since it is a privilege to hunt wild game, a hunter tacitly consents to the inspection of any game animal in his possession when he makes application for and receives a hunting license. It is apparent from the evidence that the defendant was not hunting prior to the stop. The intrusion into the right of the non-hunter to the uninterrupted use of the highways is slight and greatly outweighed by the public interest in the management and conservation of wildlife in this state." (*Halverson*, 277 N.W.2d at 724-25.)

The fact that such roadblock and checkpoint stops have been upheld cannot be equated to a rule that these are the only methods of enforcing game laws which do not violate the fourth amendment.

The trial court here concluded that this stop, and the ensuing search, was administrative in nature. (See J. Hall, Search and Seizure §11:15, at 463-64 & nn.17.14 through 17.16 (Supp. 1988).) In *Camara* and the companion case, *See v. City of Seattle* (1967), 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737, the Supreme Court found fourth amendment interests were implicated in warrantless administrative inspections so as to require that government inspectors, if turned away by the owner or occupant of premises, must obtain a warrant. (See generally Annot., 53 A.L.R.4th 1168 (1987) (government health officer's warrantless search, propriety of, post-*Camara*).) The rationale underlying such a rule in the administrative inspection of premises and businesses cannot, however, be said to apply equally in the context of inspections by game wardens in the field.

We recognize that some other courts have upheld warrantless searches in game and wildlife regulation under (1) an emergency exception to the administrative warrant requirement, or (2) a pervasively regulated industries exception.

The Supreme Court stated in *Camara* that its holding was not "intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations." (*Camara*, 387 U.S. at 539, 18 L. Ed. 2d at 941, 87 S. Ct. at 1736.) The

emergency exception to the administrative warrant requirement has been deemed to include, for example, those cases where fire marshalls enter a still-smoldering building for the purpose of determining the cause of the blaze before relevant evidence is destroyed. (See, *e.g.*, *Michigan v. Tyler* (1978), 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942; see generally Annot., 31 A.L.R.4th 194 (1984) (admissibility, in criminal case, of evidence discovered in warrantless search connected with fire investigation).) As stated in a treatise on search and seizure:

> "Some courts have held that warrantless inspections by fish and game officials may be carried out under the exigent circumstances exception, since a requirement that a warrant be obtained before an inspection is made would frustrate the purpose of the statutes establishing limits on the types and amount of animals that may be caught. Therefore, the boarding of fishing vessels or the stopping of vehicles in a hunting area without a warrant has been upheld because of the 'readily movable' quality of the evidence of a game violation." (I W. Ringel, Searches & Seizures, Arrests & Confessions §14.3(b)(1), at 14-17 (2d ed. 1989).)

Similarly, although the Supreme Court has suggested that the persuasively regulated industries exception to the warrant requirement is a narrow one, as observed by one commentator, "[c]ourts have also found that hunting and commercial fishing are persuasively regulated businesses ***." I W. Ringel, Searches & Seizures, Arrests & Confessions §14.3(b)(2), at 14-20 through 14-21 (2d ed. 1989), citing *United States v. Raub* (9th Cir. 1980), 637 F.2d 1205, *cert. denied* (1980), 449 U.S. 922, 66 L. Ed. 2d 150, 101 S. Ct. 322 (commercial fishing); *Tallman v. Department of Natural Resources* (1984), 421 Mich. 585, 365 N.W.2d 724 (commercial fishing); *State v. Westside Fish Co.* (1977), 31 Or. App. 299, 570 P.2d 401 (wholesale fish dealer); and *Halverson*, 277 N.W.2d 723 (hunting).

### III

We conclude the search here was lawfully executed under the State's police power. We disagree, however, with characterizing this as an administrative search, and so decline to treat it as within the aforementioned exceptions to the warrant requirement.

■ In this State, hunting is highly regulated, arguably more so than driving. Hunting is a privilege, not a right, to which licensing requirements apply. Because of the nature of hunting, we conclude that licensing (or hunting without a license) may be deemed consent to some intrusions. In so holding, we are cognizant of the concerns of

such commentators as Professor LaFave (see 4 W. LaFave, Search and Seizure §10.8(e), at 85-89 (2d ed. 1987); 3 W. LaFave, Search and Seizure §8.2(*l*), at 219-21 (2d ed. 1987)) and, accordingly, the exception we recognize is a narrow one.

■ Section 1.19 of the Code authorizes in-the-field examination of equipment and devices, and necessarily authorizes some brief stop and investigation by a conservation officer in relation to conducting such an examination. Similarly, section 1.19 authorizes examination of vehicles, game bags, game coats, or other receptacles as game officers have "reason to believe" contain wild birds or mammals. "Reason to believe," *i.e.*, probable cause to search, arises from indicia that the person in question is a hunter, immediately or very recently engaged in hunting. Such indicia might include wearing hunting garb, carrying a weapon, and carrying game or a game bag, in conjunction with location in or near a hunting situs. Here, the officer's testimony shows such indicia were present.

As defendant fit what might be termed a "hunter's profile," we deem implied consent sufficient to sustain the search—which we emphasize was, according to the officer's testimony, limited to containers of a size and type as experience dictated might be used for holding separate any illegally taken game, and did not extend, *e.g.*, to locked luggage.

This exception is *limited to* conservation and game officers pursuing game violations—and does not extend to law enforcement officers generally—and is an exception because of *necessity*.

■ It is elemental that wildlife licensing and regulatory provisions must be enforceable during the hunt and immediately following it. The roving conservation officer patrol stopping hunters encountered in the field, as here, does not violate the fourth amendment. Neither was the search unlawful.

Accordingly, for the reasons herein stated, we affirm.

Affirmed.

GREEN and STEIGMANN, JJ., concur.