A99A0516. ELZEY v. THE STATE.
A99A0517. McDOUGALD v. THE STATE.
(519 SE2d 751)

RUFFIN, Judge.

In separate bench trials, Mickey Elzey and Richard McDougald were convicted of possession of methamphetamine. Each defendant appeals the denial of his motion to suppress. Because both cases raise the same issue, we have consolidated them for appeal, and we affirm the trial court's ruling in each case.

In reviewing a trial court's ruling on a motion to suppress, "the evidence is construed most favorably to uphold the findings and judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them." (Punctuation omitted.) *Sprinkles v. State,* 227 Ga. App. 112 (1) (488 SE2d 492) (1997).

*Case No. A99A0517*

Fred Granitz, a law enforcement officer with the Department of Natural Resources (DNR), testified that, while on a routine patrol on December 5, 1996, he, Officer Harry Luke, and Officer Freddie Hayes approached two hunters who were sitting in a parked truck in the B. F. Grant Wildlife Management Area. Granitz testified that he approached the passenger, Richard McDougald, to ask him about his hunt — "[r]outine questions, conversation, public relations" — and also to check his hunting license. After noticing that McDougald seemed "anxious" and "upset," Granitz spoke with him about safety issues, including the fact that there had been several tree stand accidents at the management area, and that they had been having a problem with alcohol and drugs. Granitz asked if McDougald had or

had been using any drugs, and McDougald replied that he had not. Granitz testified that he then asked for and received permission to search McDougald and the vehicle. Granitz discovered a plastic bag containing methamphetamine in McDougald's pants.

*Case No. A99A0516*

Officer Granitz testified that on December 14, 1996, he and Officer Luke were on a routine patrol in the Cedar Creek Wildlife Management Area, assisting with a managed firearm deer hunt. He testified that, as hunters returned from a morning or afternoon hunt, he and Luke would check the various campgrounds in the wildlife management area to speak to the hunters, see if they had killed a deer, and perform public relations. As they approached the Lazenberry Mill hunting campsite, they saw Elzey, who appeared to be breaking camp. Granitz approached Elzey to speak to him and noticed that Elzey was sweating profusely, had red, glassy eyes, and was "sort of nervous acting." Granitz testified that he spoke to Elzey about safety matters, including deer stands, alcohol, and drugs. He then asked Elzey if he would consent to a search of his person and vehicle. At that point, Elzey reached into the pocket of his coveralls, pulled something out of the pocket, and held it up. Granitz testified that he did not know what Elzey was pulling out of his pocket — "[i]t could have been a weapon, drugs, anything" — so he grabbed Elzey's wrist and asked what was in his hand. Elzey then dropped a white baggy containing methamphetamine into Officer Luke's hand.

Officer Luke testified that he heard Granitz ask for and receive permission to search Elzey, and that he saw Elzey produce the methamphetamine from his overalls. Luke testified that he had spoken with Elzey on two occasions earlier in the week. He checked Elzey's hunting license on one of those occasions, but did not recall whether he checked Elzey's license the day he was arrested.

On appeal, McDougald and Elzey do not contest the fact that they voluntarily consented to be searched, nor do they challenge the propriety of the officers' actions in asking for consent or in performing the searches in question. Rather, their sole contention is that the officers had no right to approach them in the first place to check their hunting licenses and identification. They argue that the officers' actions were analogous to setting up a roadblock to stop motorists and check for driver's licenses. Citing *State v. Golden*, 171 Ga. App. 27, 29-30 (2) (318 SE2d 693) (1984), they contend that the stops were unlawful because the officers exercised discretion in deciding which hunters to approach and were not acting pursuant to orders of a supervisor.

Defendants' assertions are without merit, as the actions of a

DNR officer in approaching hunters in a state-operated wildlife management area not analogous to those of a police officer conducting a roadblock on a public highway. Hunting in Georgia is a highly regulated activity, governed by a complex set of rules designed for a variety of purposes, including safety, wild game management, and revenue generation. See OCGA § 27-1-1 et seq. Pursuant to OCGA § 27-1-3 (a), all wildlife in Georgia is owned by the state and within the custody of the DNR. OCGA § 27-1-3 (b) states that hunting

> is declared to be a privilege to be exercised only in accordance with the laws granting such privilege. Every person exercising this privilege does so subject to the right of the state to regulate hunting . . . and it shall be unlawful for any person participating in the privileges of hunting . . . to refuse to permit authorized employees of the [DNR] to inspect and count such wildlife to ascertain whether the requirements of the wildlife laws and regulations are being faithfully complied with.

Among other things, no individual is permitted to hunt in a state-operated wildlife management area without having purchased a special wildlife management area stamp as well as a hunting license. OCGA §§ 27-1-33 (a); 27-2-23 (9); Ga. Admin. Code § 391-4-2-.13. In addition to promoting safety and game management, this requirement is intended to generate revenue to support DNR's operations. See OCGA § 27-1-13 (a). Pursuant to OCGA § 27-2-28 (a), it is unlawful for an individual to refuse to produce his hunting license or permit, as well as his driver's license or other equally reliable identification, when requested to do so by a DNR officer.

In his special concurrence in *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), Justice Blackmun recognized the special nature of hunting and its effect on search and seizure law. In that case, the Supreme Court held that a suspicionless stop of an automobile to check the driver's license and registration violates the Fourth Amendment. Id. at 663. In his special concurrence, Justice Blackmun, joined by Justice Powell, stated that

> I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

Id. at 664 (Blackmun, J., concurring specially).

Other state courts that have considered the issue have recognized that the peculiar nature of hunting leads to a diminished expectation of privacy on the part of hunters. In *People v. Perez*, 51 Cal. App.4th 1168, 1177-1178 (59 Cal. Rptr.2d 596) (1996), a California appellate court held that

> [i]n analyzing the reasonableness of the search (inspection) and seizure (detention) of hunters, the special nature of hunting is significant. . . . [H]unting is a highly regulated activity. The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good. The high degree of regulation over the privilege of hunting, in turn, reduces a hunter's reasonable expectation of privacy. . . . Given the highly regulated nature of hunting and the corresponding reduced expectation of privacy of hunters in their gear and their take from hunting, we find it is reasonable to detain hunters briefly, near hunting areas during hunting season, to inspect their licenses, tags, equipment, and any wildlife taken.

(Citations and punctuation omitted.) Similarly, in *State v. McHugh*, 630 S2d 1259, 1265 (La. 1994), the Louisiana Supreme Court recognized that

> [t]he state has a special governmental need outside the ordinary law enforcement context to have its wildlife law officers stop hunters during open season near game habitat, check for hunting licenses, inquire about game taken, and request to inspect game in field possession. In this capacity, the wildlife officers act not only as law enforcers but also as public trustees protecting, conserving and promoting replenishment of the wildlife of the state. One of their trusteeship functions is to serve as front line gatherers of information necessary to the intelligent formulation and revision of laws, regulations and policies affecting and regulating seasons, limits, management areas, food chains and supplies, and other factors related to the protection of the wildlife.

(Citations omitted.) The court thus upheld suspicionless stops of hunters to check for licenses and make game inquiries, reasoning that "the overall degree of interference with the privacy of citizens in general is slight because it is far less intrusive than that involved in

other forms of suspicionless stops." Id. at 1266.

In *People v. Layton*, 196 Ill. App.3d 78 (552 NE2d 1280) (1990), an Illinois appellate court upheld a stop similar to those in the present case. In *Layton*, a conservation officer observed several hunters returning to their vehicles, apparently after concluding their hunt. The officer then approached the hunters to check their hunting licenses and inspect their vehicles for illegal game. During his search of the defendant's vehicle, the officer discovered several bags containing cannabis. Id. at 79. The appellate court upheld the search, holding that, given the highly regulated nature of hunting, hunters are deemed to have consented to certain intrusions on their privacy. Id. at 87. The court expressly rejected the defendant's contention that hunters may properly be stopped and searched only at designated roadblocks and game checkpoints, stating that "[t]he fact that such roadblock and checkpoint stops have been upheld cannot be equated to a rule that these are the only methods of enforcing game laws which do not violate the fourth amendment." Id. at 86. The court held that "[i]t is elemental that wildlife licensing and regulatory provisions must be enforceable during the hunt and immediately following it. The roving conservation officer patrol stopping hunters encountered in the field, as here, does not violate the fourth amendment." Id. at 88.

We believe the above cases correctly recognize that actions by wildlife law enforcement officers in questioning hunters and checking their licenses and identification may be reasonable, even though such actions might be unreasonable outside the hunting context. Clearly, a DNR officer may approach a hunter in a state-operated wildlife management area to determine whether the hunter has the necessary license and permits and to ask him questions about his hunt, regardless of whether the officer has reason to suspect that the hunter has broken any laws. See *Layton*, supra; *Perez*, supra.

Although defendants argue that the officers did not stop every hunter they saw, we see no reason why this should affect the validity of their actions, particularly since defendants do not contend that the officers' stated reasons for approaching them were pretextual. Moreover, Officer Luke testified in McDougald's trial that it was his practice to stop every hunter he encountered going into or coming out of the woods, although he would not stop hunters while in a tree stand and would not necessarily check licenses when he encountered people in camp in the evening when they were not actively hunting. He testified that there were about 450-500 hunters in the management area on the day in question. Officer Granitz testified that he would generally check every hunter's license, unless he had already checked it previously. Officer Luke also testified in Elzey's trial that he would generally check every hunter's license unless he had already checked

it previously. In *McHugh*, supra, the relevant state statute *required* game agents to check every hunter in their territory. However, the court held that the failure to check all hunters due to lack of forces did not render the agents' actions arbitrary, and that "a claim that a particular exercise of discretion in making suspicionless hunting license checks and game inquiries was unreasonable is subject to post-stop judicial review." Id. at 1266-1267. In this case, defendants have not shown that the officers acted unreasonably or arbitrarily in approaching them.[1]

Defendants do not contend on appeal that the officers exceeded the scope of permissible activity in asking for consent to search, nor do they challenge the manner in which the officers performed the searches in question, but argue simply that the officers had no right to approach them in the first place to check their licenses and identification. Because this contention is without merit, the denials of their motions to suppress must be affirmed.

*Judgments affirmed. McMurray, P. J., and Andrews, J., concur.*

DECIDED JUNE 24, 1999 —
RECONSIDERATION DISMISSED JULY 12, 1999 

*William S. Hardman*, for appellants.
*Fredric D. Bright, District Attorney, Shelley S. Tice, Richard M. Gailey, Jr., Assistant District Attorneys*, for appellee.

---

[1] With respect to Elzey, we note that Officer Luke, but not Officer Granitz, had already checked Elzey's license a day or two before the incident in question, although he apparently had not checked Elzey's hunting companion's license. Officer Luke's testimony shows that he approached Elzey not to check his hunting license, but to ask about his hunt and talk about safety issues. Elzey does not argue that this fact affects the validity of the officers' actions in approaching him.