[Crim. No. 10490. Fourth Dist., Div. Two. Apr. 11, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CLAIR DICKINSON, Defendant and Appellant.

COUNSEL

Garza, Kassel & Jordan and Donald W. Jordan, Jr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney Gen-

eral, Harley D. Mayfield and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GARDNER, P. J.—Following denial of his suppression motion, defendant pleaded guilty to possession of marijuana for sale. The appeal challenges the stop and search of defendant's vehicle at a California plant quarantine inspection station.

The California Department of Agriculture maintains a list of quarantined pests harmful to the agriculture of this state. These pests may be either animal or vegetable. Agricultural Code section 5341 provides: "To prevent the introduction into, or the spread within this state, of pests, the director shall maintain at such places within this state as he deems necessary plant quarantine inspection stations for the purpose of inspecting all conveyances which might carry plants or other things which are, or are liable to be, infested or infected with any pest." Agricultural Code sections 5344 and 5345 make it unlawful to fail to stop at an inspection station. Agricultural Code section 5346 makes it "unlawful for any person to conceal any plant from any plant quarantine officer or to fail to present it or any quarantined article for inspection at the request of such officer."

The inspection station in issue herein is located east of Needles, California, approximately five miles west of the Arizona border. It is a permanent facility with warning signs at a distance of one mile and one-half mile before getting to the station that an inspection will occur. There are other signs requiring all vehicles to stop.

At about noon on May 10, 1978, defendant and his companion approached the Needles inspection station from the direction of Arizona. Department of Agriculture Plant Quarantine Officer Hart was on duty at that time and responsible for one lane of traffic. Hart noted that defendant's vehicle bore Michigan license plates. This was an indicator to Hart that a more detailed inspection was necessary. The reason for this is that the states east of the Rockies represent the greatest threat to California for quarantined pests. Hart was in the standard uniform of his office which was a pair of green pants and a yellow short-sleeved

shirt with patches on the shoulders indicating that he was from the Department of Agriculture.

Hart identified himself and requested, not demanded, to look into defendant's vehicle trunk. Defendant said nothing but exited his vehicle, walked to the rear of his vehicle, unlocked the trunk with his key, and opened the trunk up for Hart's inspection. Hart described defendant as very cooperative. Inside of defendant's trunk was 200 to 300 pounds of marijuana wrapped in plastic. In one spot the plastic appeared cut over about an 8-inch area and some vegetable material was extruding from the cut. Hart reached in and took a pinch of the substance to inspect it. He discussed the substance with the defendant and they agreed that it appeared to be compost. In fact Hart suspected it was marijuana. In any event, Hart gave defendant a clearance slip and defendant went upon his way.

Hart then contacted officers of the California Highway Patrol. These officers were inspecting trucks at a distance of approximately 100 yards from the inspection station. Hart showed the sample of the substance which had been in the trunk to one of the officers. The substance had fallen to the ground during Hart's inspection of the trunk. Thereafter, the Highway Patrol apprehended defendant.

Testimony was adduced concerning the importance of the inspection stations and the quarantine of pests. The record indicates that agriculture is the number one business in the State of California. California produces 40 percent of the nation's first fruit, 33 percent of the first vegetables, and 10 percent of all agricultural products in the United States. There are 12 commodities of which California produces 90 percent to 100 percent of the crop.

The purpose of the quarantine system and the inspection stations is to preclude admission into the state of 29 different pests which have been quarantined after it having been ascertained that they are destructive to the crops of this state.

There was testimony that the only effective means to preclude quarantined pests has proven to be the system of inspection stations. Once pests are introduced into the agricultural crop of this state, it is not a simple matter to eradicate. An example was given of the gypsy moth

which was trapped in a three-block area in the San Jose vicinity. It required over a million dollars and three years to eradicate the gypsy moth from that three-block area.

Testimony established that the Needles station is not regularly manned but instead is used about 40 hours a month to spot check the effectiveness of the Arizona program. The State of California pays the State of Arizona to maintain an inspection system for pests on the northern and eastern borders of Arizona. The Needles station allows California to monitor the successfulness of the Arizona program. Pests are found at the Needles station. There was testimony that the Needles station was an integral part of the entire inspection station system and without it there would be no way of knowing whether the Arizona stations were effectively doing the job of serving as a buffer for California.

The constitutionality of the inspection stations, under both state and federal Constitutions, is at issue. We do not think it necessary to belabor the point that a substantial public interest is involved in the effective enforcement of the pest quarantine. The record is undisputed that the inspection stations represent the only effective means of enforcing the quarantine. Once pests are introduced, it becomes a very expensive and time-consuming operation to eradicate them and the difficulty factor is on the increase due to limitations placed on the use of pesticides through the action of the environmental protection agency.

The first question is whether motorists can be stopped at the inspection stations. To that extent the situation is comparable to fixed border patrol checkpoints designed to intercept illegal aliens. *United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, [49 L.Ed.2d 1116, 96 S.Ct. 3074], determined that checkpoints do not constitute a Fourth Amendment violation of the rights of motorists and their passengers. The court found that neither warrant nor probable cause was required to briefly stop motorists at the checkpoint to ask a few questions. The same held true of singling out some of the motorists and their passengers for further inquiry which caused an additional three- to five-minute delay in most cases.

To search for illegal aliens beyond areas in plain view requires either probable cause, a warrant or consent according to *Martinez-Fuerte.* (Accord: *United States* v. *Ortiz* (1975) 422 U.S. 891 [45 L.Ed.2d 623,

95 S.Ct. 2585].) Should this same standard be applied to plant quarantine inspection stations, we are at a loss as to how probable cause would develop for the plant quarantine officer to believe a maggot-infested, quarantined, pest-ridden orange was in the trunk of the vehicle. One does not easily forget he is transporting an illegal alien in his vehicle trunk but a piece of fruit or other plant tossed into the trunk, perhaps by one of the children, may be forgotten or totally unknown to the adult in the vehicle. There is a vast difference between the two circumstances. The motorists are not taken into custody if they possess offending plants for that is not in itself a crime. The quarantine officers are looking for offending plants, not people.

While *Martinez-Fuerte* is instructive on the propriety of quarantine officers briefly stopping persons to inquire concerning bringing plants into the state, fortunately the totality of the issue before us has been decided in several jurisdictions. We first turn to *Sharpe* v. *State* (Fla.App. 1979) 370 So.2d 42, a Florida case in which the defendant was stopped on a highway by a uniformed agricultural inspector. The inspector sought to inspect the vehicle pursuant to state law which allowed such inspections. The inspections were for the purpose of disease control, fruit and vegetable grading, and similar matters. The court upheld a search of the enclosed truck despite the defendant's contention that the agricultural inspectors should have limited their inspection to a few questions and a plain view search. However, the Florida statute essentially related only to commercial vehicles. That is not the situation before us. (Also see *Stephenson* v. *Dept. of Agr. & Consumer Services* (Fla. 1976) 342 So.2d 60, for the same result as *Sharpe*.)

Of much greater assistance is *State* v. *Bailey* (1978) 120 Ariz. 399 [586 P.2d 648] which, factually, is virtually identical to the case before us. In that case the defendant, driving a vehicle with Kansas license plates, approached the Arizona border after passing signs indicating that a checkpoint was ahead. A uniformed plant quarantine inspector explained that she was conducting an agricultural inspection for California and Arizona and requested that the vehicle trunk be opened. The driver testified that he complied because he thought that he had no alternative. Inside the trunk was marijuana. The inspector allowed the defendant to pass through and reported the matter to the police. These are the same facts as before us. The court rejected the defendant's challenge of the agricultural inspection, finding it not violative of the

Fourth Amendment. The Arizona case adopted the reasoning of *United States* v. *Schafer* (9th Cir. 1972) 461 F.2d 856.

In *Schafer* a federal plant quarantine was involved. The Secretary of Agriculture had declared quarantined the State of Hawaii to prevent the spread of certain plant disease infestations to the mainland of the United States. As part of the quarantine, inspections were required of all persons leaving Hawaii by air. The inspection included all baggage and personal effects of passéngers for the purpose of determining whether they contained quarantined plant pests. The defendant in *Schafer* was searched as part of the plant quarantine and marijuana was discovered in her handbag. LSD was also discovered in the handbag and also in another bag. The question resolved in *Schafer* was whether the Fourth Amendment prohibited the search. Conceptually the situation is indistinguishable from the matter before us. *Schafer* determined that neither warrant nor probable cause was required.

"Here, however, the time element is a major consideration. The objects of the search (quarantined fruits, vegetables, and plants) can easily be transported out of Hawaii to the continental United States by departing tourists. The effect of such movement on agricultural crops in the mainland states could be serious, as each of the quarantined items may carry some form of plant disease or insect which could destroy crops in the other areas. The purpose of the quarantine is to avoid these effects by preventing the movement of the potentially dangerous plant substances. We think a search warrant requirement would 'frustrate' the purpose of these inspections, because of the time delays inherent in the search warrant mechanism. Unless all departing passengers could be detained while warrants could be obtained, the goods would be moved before the warrants could issue. Whereas, in *Camara* [*Camara* v. *Municipal Court* (1967) 387 U.S. 523 (18 L.Ed.2d 930, 87 S.Ct. 1727)] there was no suggestion that 'fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable search warrant requirement,' [citation omitted] we are persuaded that requiring warrants for agricultural inspections of this type would effectively cripple any meaningful quarantine." (At p. 858.) On probable cause the court noted that no particular knowledge about particular individuals was involved. "In view of the fact that a quarantine inspection is not a search 'which has as its design the securing of information...which may be used to effect a further deprivation of life, liberty or property,' [citation omitted], and the fact that 'it is doubtful that any other canvassing technique would achieve acceptable results,'

[citation omitted], we think that the general administrative determination of the necessity for these baggage searches at the Honolulu airport satisfies the 'probable cause' requirements of *Camara*." (At p. 859.)

■ Under the facts of this case, and particularly in light of the authorities we have cited, we are satisfied that there was no Fourth Amendment violation here. The scope of our decision is simply that the quarantine officers may stop motorists at the inspection stations and request to look into the trunk of the vehicle. This is in accord with *United States* v. *Ortiz* and *United States* v. *Martinez-Fuerte*. If the motorist voluntarily opens the trunk of the vehicle, the quarantine officer may look therein and, as here, remove any plant materials in plain view for further inspection. We do not address the full scope of search which may be available for quarantine purposes as that is unnecessary to our decision.[1] We also do not decide anything concerning the refusal to allow search for that is not the case before us.

Defendant seeks to segregate the Needles station from other stations on the basis that it is not maintained full time as an inspection point. He relies on the testimony that it serves as a check on the effectiveness of the Arizona inspection program. The evidence in this case is that the Needles operation, and the manner in which it is operated, is an essential and integral part of the entire quarantine system. ■ Given these circumstances, we find no reason justifying some separate treatment for this inspection station. We find no persuasion in the concept that if the station was operated 24 hours a day, 7 days a week, and thus was more intrusive, it may be constitutionally permissible but because it is operated in a less intrusive manner, it is an unconstitutional and unwarranted interference with Fourth Amendment rights.

■ We find no reason to adopt defendant's suggestion that a sign should be placed at inspection stations or quarantine officers should advise motorists that they may refuse to give their consent to any search. No authority is cited for such a requirement and to hold in accordance with this view would extend this decision beyond the scope necessary for resolution. There was no warning sign and there was no advice by the quarantine officer—this did not render the circumstances of this case

---

[1]In *United States* v. *Ortiz, supra*, it was said: "Nor do we suggest that probable cause would be required for all inspections of private motor vehicles. It is quite possible, for example, that different considerations would apply to routine safety inspections required as a condition of road use." (422 U.S. at p. 897, fn. 3 [45 L.Ed.2d at p. 629].)

violative of the Fourth Amendment or article I, section 13, of the California Constitution.

Judgment affirmed.

McDaniel, J., and Morris, J., concurred.