[No. C021585. Third Dist. Dec. 19, 1996.]

THE PEOPLE, Plaintiff and Appellant, v.
MICHAEL JAMES PEREZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret Venturi and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Appellant.

Louis Marinus Wijsen, under appointment by the Court of Appeal, for Defendant and Appellant.

## OPINION

**MORRISON, J.**—After his motions to suppress evidence (Pen. Code, § 1538.5) and set aside the information (Pen. Code, § 995) were denied, defendant entered a plea of guilty to possession of methamphetamine (Health & Saf. Code, § 11377) and unlawful possession of waterfowl (Fish & G. Code, § 2002). He was granted probation, on the condition he serve 60 days' home arrest with electronic monitoring. Both parties appeal. Defendant contends his motion to suppress should have been granted because he was unlawfully detained at the fish and game checkpoint; the People challenge the sentence as unauthorized. Only the People's contention has merit. We determine the fish and game checkpoint did not result in an unreasonable search or seizure under the Fourth Amendment. The trial court, however, exceeded its jurisdiction in ordering home detention as a condition of probation, so the sentencing order must be vacated.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 9, 1994, coinciding with the opening of hunting season at Lower Klamath Tulelake Basin, the Department of Fish and Game conducted a roadside waterfowl inspection site. The checkpoint was located on highway 97, three miles south of the Oregon border and about three miles from the hunting area. It was operated in conjunction with the permanent Dorris Agriculture Checkpoint station. The checkpoint was manned by six uniformed fish and game officers and there were four or five marked fish

and game vehicles present. There were also two federal fish and wildlife agents present, not in uniform.

The checkpoint was established in accordance with the statewide operating policy which sets parameters and requires four levels of supervision. The supervisor proposing the checkpoint files an operational plan with his captain. The plan is then routed to the regional patrol chief for approval. The stated purpose of the checkpoint is to educate and to implement regulations for monitoring the harvest and transportation of waterfowl. The wardens would answer questions about hunting regulations, but they did not pass out any written material. Notice of the checkpoint was given to the local press, television, and radio. About 325 to 340 vehicles were stopped that day, resulting in 56 citations.

The site was selected primarily for safety. Vehicles would already be stopping for the adjacent agricultural checkpoint. Due to the layout of the land, the chosen location provided the opportunity to inspect the most hunters at one location. The checkpoint was operated from 10 in the morning until sundown.

All vehicles were first stopped at the agricultural checkpoint. The agricultural inspectors asked motorists if they had been hunting. If there was visible evidence of hunting activity or the people responded positively to the inquiry, their vehicle was marked with a yellow decal and they were directed to the fish and game checkpoint. If there were no indicia of hunting and the response was negative, the vehicle was directed to proceed straight through.

The operational plan for the fish and game checkpoint limited contact to five minutes unless there were circumstances justifying further detention. If the traffic backed up, the initial stop was limited to every third or fifth car. The checkpoint terminated if a supervisor was not available. There were signs on the highway giving notice of the agricultural checkpoint; the only signs about the fish and game checkpoint were not visible until after the vehicle had proceeded through the agricultural checkpoint. There was no bypass option at the checkpoint. Official policy discouraged pursuits.

Warden Konvalin was working at the fish and game checkpoint when a tan pickup marked with a yellow decal was directed there; there were two men inside. As the truck approached, Konvalin observed "something going on in the front of the vehicle." Konvalin asked the driver, codefendant Gear, if he had been hunting. Gear said yes. Inside the truck Konvalin saw a fanny pack with clear plastic tubing coming out of it with a clip on the tubing and a large propane lighter. Gear looked tired or under the influence; he had

bloodshot eyes, a red face, thick speech, and restricted pupils. Konvalin asked if they had ducks or weapons in the vehicle; Gear said the ducks and weapons were in the back.

Warden Harrison came over to help with the inspection because Konvalin was concerned about Gear's condition. Defendant was in the process of obtaining his hunting license and stamps when he got out of the passenger seat to display his waterfowl. As he stepped from the vehicle, a cocked nine-millimeter pistol fell to the seat. Gear said the gun was his, that he kept it for protection. Konvalin then searched the cab of the truck for additional weapons. He found an ammo pouch; inside were four small bags containing white powder and a piece of paper with Gear's name on it. Gear identified the pouch as his and the contents as methamphetamine. He was arrested.

Warden Harrison asked defendant if he could inspect the back of the truck. Defendant said; "Yes. Go ahead, check anything you want." The search revealed drug paraphernalia and drugs. In a satchel claimed by defendant there was a loaded Colt revolver and a small baggie containing a white substance. In the ice chest there were several waterfowl that had the heads and wings removed in violation of the law.

Defendant and Gear were charged with drug offenses, with armed allegations, and the misdemeanor offense of unlawful possession of waterfowl. At the preliminary hearing, Gear moved to suppress evidence, contending the checkpoint was unconstitutional. The magistrate denied the motion.

Defendant was appointed new counsel after the preliminary hearing. This new counsel joined in Gear's renewal of his motion to suppress and in a motion to set aside the information. These motions were denied.

Defendant pled guilty to possession of methamphetamine and unlawful possession of waterfowl. He was granted probation. The People wanted jail time as a condition of probation. Over the People's strenuous objection, defendant was ordered to serve 60 days' home arrest with electronic monitoring provided by Hayden Consulting.

DISCUSSION

I

Defendant contends the fish and game checkpoint resulted in an unreasonable detention in violation of his Fourth Amendment rights.

"It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment." (*United States* v. *Martinez-Fuerte* (1976) 428

U.S. 543, 556 [49 L.Ed.2d 1116, 1127, 96 S.Ct. 3074].) The reasonableness of a seizure not amounting to an arrest "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' [Citations.]" (*Brown* v. *Texas* (1979) 443 U.S. 47, 50 [61 L.Ed.2d 357, 361, 99 S.Ct. 2637].) This balancing test involves weighing the importance of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. (*Id.* at p. 51 [61 L.Ed.2d at p. 362].) In balancing these considerations, a central concern is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary intrusions solely at the unfettered discretion of officers in the field. "To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. [Citations.]" (*Ibid.*)

■ Defendant contends the fish and game checkpoint does not qualify as a permissible regulatory or administrative stop. He argues the stop was not conducted as part of a regulatory scheme for an administrative purpose, but as a criminal investigation to secure evidence of criminal activity. Accordingly, he asserts individualized suspicion under the standards of *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] is required. Defendant focuses his attack on the fish and game checkpoint after the initial screening of hunters at the agricultural checkpoint. Here, the fish and game checkpoint had two phases: the initial screening of all vehicles and the further detention and inspection of hunters. We review each phase.

Regulatory checkpoint stops of vehicles have been permitted absent an individualized suspicion for border patrol inspections (*United States* v. *Martinez-Fuerte, supra,* 428 U.S. 543 [49 L.Ed.2d 1116]), agricultural inspections (*People* v. *Dickinson* (1980) 104 Cal.App.3d 505 [163 Cal.Rptr. 575]), mechanical inspections of vehicles (*People* v. *De La Torre* (1967) 257 Cal.App.2d 162 [64 Cal.Rptr. 804]), and license and registration inspections (*People* v. *Washburn* (1968) 265 Cal.App.2d 665 [71 Cal.Rptr. 577]).

In *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299], the issue before the court was the constitutionality of sobriety checkpoints. The Supreme Court began its analysis by noting that if the primary purpose of the checkpoint was to detect or gather evidence of a crime, then individualized suspicion was required for the stop. (*Id.* at pp. 1327-1328.) The court found the primary and overriding purpose of the sobriety checkpoint was a regulatory purpose of promoting public safety, as in the airport

searches held constitutional in *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830]. Although both the sobriety checkpoint and the airport search operated mechanically as a search or inspection for violation of the law, their primary purpose is to prevent and deter conduct that is injurious to persons and property. (*Ingersoll, supra,* at p. 1331.) The sobriety checkpoint was intended to counter the public's perception that apprehension for drunk driving was low. To this end, the sobriety checkpoint was accompanied by advance publicity. (*Id.* at p. 1336.)

We find that the fish and game checkpoint, while also operating as a search or inspection for violations of the law, is primarily regulatory in purpose. California holds title to its wildlife in public trust for the benefit of the people. As such the state has a duty to exercise continued supervision over the trust to prevent the harmful use of the state's wildlife resources. (*People* v. *Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151, 1154 [196 Cal.Rptr. 7].) "It is this state's policy to conserve and maintain wildlife for citizens' use and enjoyment, for their intrinsic and ecological values, and for aesthetic, educational and nonappropriative uses. . . . It is also the policy to maintain recreational uses of wildlife, including hunting, 'subject to regulations consistent with the maintenance of healthy, viable wildlife resources, the public safety, and a quality outdoor experience.' . . . Wildlife is a renewable, publicly owned resource to be maintained through regulated management." (*Betchart* v. *Department of Fish & Game* (1984) 158 Cal.App.3d 1104, 1106-1107 [205 Cal.Rptr. 135], citations to the Fish and Game Code omitted.) Hunting is a highly regulated activity; hunting seasons, bag and possession limits, manner, place, means and hours of taking and possessing are regulated, and there are restrictions on the type, sex, maturity, and other physical characteristics of wildlife that may be taken. (*Id.* at p. 1107.)

The fish and game checkpoint was designed to implement this high degree of regulation of hunting. Warden Konvalin testified the purpose of the checkpoint was to educate the public and to implement hunting regulations. As in *Ingersoll,* there was advance publicity of the checkpoint to deter illegal conduct. (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d at p. 1336.)

In determining the reasonableness of this regulatory seizure and search, we balance the invasion of individual liberty against the necessity for the invasion and its effectiveness in achieving the state's goal. (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d at p. 1338.) The state has a great and legitimate interest in the preservation and management of its natural resources, including wildlife. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 254 [104 Cal.Rptr. 761, 502 P.2d 1049].) The checkpoint inspection is

an effective means to serve this interest. Hunting is necessarily conducted in remote areas where control is difficult. The inspection checkpoint was set up at a location near a hunting area on the first day of the season. The public interest side of the balance weighs heavily in favor of permitting the seizures caused by the operation of the checkpoint.

On the other side of the scale, the intrusiveness of the initial screening of hunters is slight, especially since the screening is conducted in conjunction with the agriculture checkpoint. All vehicles are already stopped and briefly detained; the additional questioning about hunting adds little to the minimal intrusiveness. Indeed, defendant does not challenge the agriculture checkpoint. (See *People* v. *Dickinson, supra,* 104 Cal.App.3d 505.)

In *Ingersoll,* the court noted several standards that provide functional guidelines to minimize the intrusiveness of the checkpoint stop. These standards are decisionmaking at the supervisory level, limits on the discretion of field officers, maintenance of safety conditions, a reasonable location, a reasonable time and duration, indicia of the official nature of the roadblock, a reasonable length and nature of the detention, and advance publicity. (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d at pp. 1341-1346.) The evidence adduced at the preliminary hearing indicated the statewide policy for fish and game checkpoints was designed with these guidelines in mind.

Nonetheless, defendant contends that the fish and game checkpoint fails to meet several of these guidelines. Defendant argues the decision to establish the checkpoint and the establishment of its procedures were made without notifying either the district attorney or the Attorney General. The guideline set forth in *Ingersoll* is that the decision to establish the checkpoint, the selection of the site, and the procedures for operation should be made at the supervisory level, not by field officers. (*Ingersoll* v. *Palmer, supra,* 43 Cal.3d at pp. 1341-1342.) Konvalin detailed the chain of command for approving a checkpoint operation. The guideline is met here.

Next, defendant contends vehicles were not stopped according to a neutral formula, as only suspected hunters were detained. All motorists, however, were subject to the initial screening. If the traffic backed up, the fish and game procedure was to stop every third or fifth car. The checkpoint utilized a neutral formula. We consider later whether the further detention of hunters was constitutionally permissible.

Defendant objects to the lack of signs warning of the fish and game checkpoint. There were no such signs until after the initial screening. The purpose of signs is for safety and to reassure motorists that the stop is

officially authorized. (*Ingersoll* v. *Palmer*, *supra*, 43 Cal.3d at p. 1345.) This purpose was accomplished by the signs advising of the agricultural checkpoint and, for those further detained, by the signs of the fish and game checkpoint and the presence of uniformed officers and their marked vehicles.

Finally, defendant argues it is unlikely there was advance publicity of the checkpoint. While the record reveals that notice was given to the local press, television, and radio, it does not reveal what, if any, publicity was actually generated. A lack of publicity, however, is not fatal to the constitutionality of the checkpoint where other standards to limit intrusiveness are met. (*People* v. *Banks* (1993) 6 Cal.4th 926, 949 [25 Cal.Rptr.2d 524, 863 P.2d 769] [sobriety checkpoint upheld despite lack of advance publicity].)

 Having determined the initial screening of hunters, conducted here by agricultural inspectors at the request of fish and game officers, passes constitutional muster as a reasonable seizure, we turn to the detention for inspection. In the case of a sobriety checkpoint, further detention results when there is evidence that the detainee has been driving while intoxicated, that is, once there is a reasonable suspicion of criminal activity. Here, the detainees have only been hunting, which provides no evidence or even suspicion of criminal activity.

In analyzing the reasonableness of the search (inspection) and seizure (detention) of hunters, the special nature of hunting is significant. Indeed, the issue of the constitutionality of warrantless inspections by game wardens was anticipated by Justice Blackmun in his concurring opinion in *Delaware* v. *Prouse* (1979) 440 U.S. 648 [59 L.Ed.2d 660, 99 S.Ct. 1391]. In *Prouse,* the court found roving patrols to check the licenses and registration of motorists were unconstitutional. Justice Blackmun stated: "I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties." (*Id.* at p. 664 [59 L.Ed.2d at p. 674] (conc. opn. of Blackmun, J.).)

 As explained above, hunting is a highly regulated activity. "The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good." (*Ex parte Maier* (1894) 103 Cal. 476, 483 [37 P. 402].) The high degree of regulation over the privilege of hunting, in turn, reduces a hunter's reasonable expectation of privacy. (*Betchart* v. *Department of Fish & Game, supra,* 158 Cal.App.3d at p. 1110.)

Under Fish and Game Code section 2006, officers have authority to check a hunter's rifles and shotguns to determine if they are loaded. (*People* v. *Johnson* (1980) 108 Cal.App.3d 175, 179 [166 Cal.Rptr. 419].) Game wardens may inspect receptacles, except the hunter's clothing, where wildlife may be stored. (Fish & G. Code, § 1006.) Fish and Game Code section 2012 requires hunters to exhibit on demand licenses, tags, and the wildlife taken. Government officials may exercise such powers as are necessary to carry out the powers granted by statute or that may be fairly implied from the statute. (*In re Cathey* (1961) 55 Cal.2d 679, 689 [12 Cal.Rptr. 762, 361 P.2d 426].) To this end, wardens may, without a warrant, enter and patrol private open lands where hunting occurs to enforce fish and game laws (*Betchart* v. *Department of Fish & Game, supra*, 158 Cal.App.3d 1104); search a restaurant to inspect commercially caught fish (*People* v. *Harbor Hut Restaurant, supra*, 147 Cal.App.3d 1151); board a vessel to inspect the fishing haul (*People* v. *Di Bernardo* (1978) 79 Cal.App.3d Supp. 5 [144 Cal.Rptr. 902]); and inspect containers known to be used to hold game (*People* v. *Johnson, supra*, 108 Cal.App.3d 175).

Given the highly regulated nature of hunting and the corresponding reduced expectation of privacy of hunters in their gear and their take from hunting, we find it is reasonable to detain hunters briefly, near hunting areas during hunting season, to inspect their licenses, tags, equipment, and any wildlife taken. Defendant contends such inspection may occur only "on site." We disagree. The remote and expansive nature of hunting areas permits an inspection at a nearby, reasonable location. That standard was met here; the checkpoint was established at a safe location, chosen for the opportunity to inspect the most hunters at a single location. Our analysis is in accord with that of other state courts that have upheld the use of fish and game checkpoints against constitutional attack. (*State* v. *Sherburne* (Me. 1990) 571 A.2d 1181 [87 A.L.R.4th 965]; *State* v. *Tourtillott* (1980) 289 Or. 845 [618 P.2d 423]; *State* v. *Halverson* (S.D. 1979) 277 N.W.2d 723.)

When defendant was asked to display his license and waterfowl, he got out of the truck and a handgun fell. Officers then searched the cab of the truck and discovered drugs in an ammo pouch. Defendant contends this search, ostensibly for officer safety, was pretextual. He argues that as a hunter returning from hunting he was authorized to have a concealed weapon under Penal Code section 12027, subdivision (g). First, we reject the argument that the search was pretextual. (*Whren* v. *United States* (1996) 517 U.S. __ [135 L.Ed.2d 89, 116 S.Ct. 1769].) The issue is not whether defendant had a right to have the gun; rather, it is the officers' right to conduct a limited search for weapons. The discovery of the gun, especially after Gear said the weapons were in the back of the truck, justified the protective

search. (*Michigan* v. *Long* (1983) 463 U.S. 1032, 1049 [77 L.Ed.2d 1201, 1219-1220, 103 S.Ct. 3469].)

The search of the satchels in the back of the truck, in which drugs and a weapon imputed to defendant were found, was conducted with defendant's consent. Further, the discovery of drugs in the ammo pouch provided probable cause for a further search for drugs. (*People* v. *Varela* (1985) 172 Cal.App.3d 757, 762 [218 Cal.Rptr. 334] [drugs found on defendant's person provided probable cause for search of vehicle's trunk]; see also *People* v. *Koch* (1989) 209 Cal.App.3d 770, 779 [257 Cal.Rptr. 483] [drugs in defendant's pickup may provide probable cause for search of his home].)

We find both the detention and search were reasonable.

II*

. . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment of conviction is affirmed. The superior court is directed to vacate its sentencing order directing service of custody in the home detention program monitored by Hayden Consulting. Since we are advised that defendant has completed the probation condition of a period of custody, remand for resentencing is unnecessary. (See *People* v. *Superior Court* (*Peterson*) (1992) 12 Cal.App.4th 16, 27 [14 Cal.Rptr.2d 685].)

Sims, Acting P. J., and Nicholson, J., concurred.

The petition of appellant Michael James Perez for review by the Supreme Court was denied March 19, 1997.

---

*See footnote, *ante*, page 1168.