LARRY D. VAUGHT, Judge 11 Jimmy Paul Pickle appeals from the Craighead County Circuit Court’s denial of his motion to suppress evidence obtained when two Arkansas Game and Fish officers (“game wardens”) conducted a war-rantless, suspicionless hunting-compliance check on Pickle’s duck-hunting party. Pickle argues that the game wardens unlawfully detained and unlawfully searched him. The State argues that (1) there was no seizure implicating the Fourth Amendment, (2) Pickle had no reasonable expectation of privacy under the open-fields doctrine, and (3) Pickle had no reasonable expectation of privacy as to his identity. Alternatively, the State argues that reasonable suspicion is not required in order for game wardens to conduct routine hunting-compliance checks. The Arkansas Game and Fish Commission has also filed an amicus curiae brief arguing that war-rantless, suspicionless hunting-compliance checks are necessary tools for game wardens, who would not otherwise be able to enforce state and federal regulations. li>We disagree with the State’s first three arguments. This case involves a seizure implicating the protections of the Fourth Amendment; the open-fields doctrine does not apply, and there is no legal authority exempting identity from the protections of the Fourth Amendment. As for whether reasonable suspicion is required for routine hunting-compliance checks, controlling precedent mandates that, in the absence of reasonable suspicion, law-enforcement activity must be governed by a plan of explicit, neutral limitations that prevent game wardens from exercising unbridled discretion. Because the circuit court’s order is silent on this key element, we reverse and remand. I. Facts At the suppression hearing, the facts revealed that on November 18, 2012, Pickle, a friend, and the friend’s minor son were duck hunting on an oxbow lake along the Cache River in' Craighead County, Arkansas. There is no dispute that the party was hunting in an allowed location, during duck season, and within permissible hunting hours. Two game wardens, Jeff McMullin and Brian Aston, were assigned to the area, patrolling for potential hunting violations. The game wardens testified that they observed Pickle’s hunting party for approximately two hours, but saw nothing to indicate any violations of law. They then made contact with Pickle and his fellow hunters in order to perform a routine hunting-compliance check, which involved verification of hunting licenses and searches for and examination of firearms, ammunition, and game. Pickle and his two companions were not actively hunting at the time; they were cooking breakfast at a campsite, with their firearms resting against nearby trees. The game wardens approached the group, identified themselves, and demanded to see the hunters’ licenses. Pickle |sidentified himself and told the game wardens that he had a valid license but that he had left it in his truck. The game wardens then picked up and examined each gun in turn, asking the group to identify the owner of each firearm. Pickle identified one of the guns as belonging to him, and it was found to be in compliance with all relevant regulations. As part of the routine hunting-compliance check, the game wardens also searched the group for ammunition or game that violated state of federal law. Pickle’s friend was issued a citation for a firearm violation. The minor child was given a warning about an ammunition violation. Because Pickle indicated that he had a valid hunting license but did not have it on his person, the game wardens then retreated a short distance and called dispatch in Little Rock to verify his license. The game wardens first ran a 10-26 Hunting and Fishing License check, which confirmed that Pickle did have a valid license. They then ran a 10-51 outstanding-warrants check, which revealed that Pickle was a convicted felon. The game wardens returned to the hunting party, arrested Pickle for being a felon in possession of a firearm, and conducted a search incident to arrest, which revealed a small amount of methamphetamine and a glass pipe used for smoking methamphetamine. Pickle was charged with felon in possession of a firearm, possession of a controlled substance, and possession of drug paraphernalia. In a motion to suppress and subsequent hearing, Pickle argued that the game wardens violated his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution by unlawfully detaining him and unlawfully searching him without reasonable suspicion. The circuit court took the issue under advisement and issued an order on September 9, 2013, denying the motion to suppress. Pickle then entered a ^conditional guilty plea, preserving his right to appeal the denial of the motion to suppress, and the circuit court accepted the plea. The circuit court placed Pickle on sixty months’ probation and ordered him to pay fees and costs. Pickle filed a timely notice of appeal. II. Standard of Review The proponent of a motion to suppress evidence bears the burden of demonstrating the basis for suppression. Norman v. State, 326 Ark. 210, 214, 931 S.W.2d 96, 99 (1996). In reviewing the denial of a motion to suppress evidence in a criminal proceeding, we make an independent examination based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause. Yarbrough v. State, 370 Ark. 31, 36, 257 S.W.3d 50, 55 (2007). We give due weight to inferences drawn by the circuit court and deference to the circuit court’s findings, and we will reverse the circuit court only if the denial of the motion to suppress was clearly against a preponderance of the evidence. Id., 257 S.W.3d at 55. Moreover, we defer to the circuit court in assessing the credibility of witnesses. Bogard v. State, 88 Ark. App. 214, 219, 197 S.W.3d 1, 3 (2004). III. Discussion Pickle argues that he was unlawfully detained and unlawfully searched, in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15 of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law. Both constitutional provisions provide essentially identical protection from unreasonable and arbitrary seizures and searches. Additionally, the Arkansas | ¡jRules of Criminal Procedure restrict law enforcement’s ability to detain or search members of the public. See, e.g., Ark. R.Crim. P. 2.2 & 3.1 (2014). There is no dispute that Arkansas Game and Fish officers are certified law enforcement officers. There is also no dispute that the game wardens in this case lacked any reasonable suspicion that Pickle or his companions were engaged in criminal conduct. The issue presented on appeal is whether game wardens are subject to the same constitutional restrictions as traditional law-enforcement officers. However, before reaching that question, we must first address three preliminary arguments presented by the State as to why the protections of the Fourth Amendment are not implicated in this case. First, we hold that the game wardens’ initial contact with Pickle, during which he identified himself and identified his gun, was a seizure implicating the protections of the Fourth Amendment or article 2, section 15. “A ‘seizure’ occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.” Thompson v. State, 303 Ark. 407, 409, 797 S.W.2d 450, 451 (1990). The State argues that this situation is more akin to one in which “an officer merely approaches an individual on the street and asks if he is willing to answer some questions.” Cockrell v. State, 2010 Ark. 258, at 17, 370 S.W.3d 197, 207 (citing Thompson, 303 Ark. at 409, 797 S.W.2d at 451-52). Under Cockrell and Thompson, such an encounter is not deemed to be a seizure “because it is in a public place and it is consensual.” Id. However, in State v. Allen, 2013 Ark. 35, at 4, 425 S.W.3d 753, 757, the Arkansas Supreme Court found that a game warden’s actions in stopping a watercraft on Lake Hamilton and boarding it briefly to conduct a safety check constituted a seizure. The State attempts to distinguish Allen by arguing that, although Allen would not have felt free to leave while a game warden was | ^aboard his boat, Pickle was free to leave at all times prior to his arrest and was under no obligation to comply with the game wardens’ requests. We disagree. Although Pickle was not physically restrained or threatened with arrest if he refused to comply, the encounter went beyond that allowable under Rule 2.2, Cock-rell, and Thompson. Rule 2.2 of the Arkansas Rules of Civil Procedure states: (a) A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. The officer may request the person to respond to questions, to appear at a police station, or to comply with any other reasonable request. (b) In making a request pursuant to this rule, no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists. Compliance with the request for information or other cooperation hereunder shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law enforcement officer. Ark. R.Crim. P. 2.2 (2011). The circuit court admitted into evidence the Arkansas Hunting Guidebook, a copy of which is available to everyone at local sporting goods stores and online, which was presented by the prosecutor as evidence of Pickle’s reasonable expectation of privacy in the hunting context. The Arkansas Hunting Guidebook clearly states that “it is not legal to” “refuse an officer’s lawful request to inspect your wildlife, tackle, hunting equipment, devices, license, or any item that can reasonably contain wildlife” or “interfere with an officer performing their duties or flee from an officer.” Arkansas Game and Fish Commission Hunting Guidebook 18 (2012-18). Therefore, we cannot agree that Pickle would have felt free to leave at any time prior to his arrest. As a result, the encounter at issue here, during which the game wardens obtained l7Pickle’s name and asked him to identify his firearm, was a “seizure” under the Fourth Amendment and article 2, section 15. Second, we reject the State’s argument that Pickle did not have any reasonable expectation of privacy because he was in an open field. While the State correctly articulates the open-fields doctrine, which holds that a person has no reasonable expectation of privacy in open lands or fields, the doctrine is inapplicable here. See, e.g., Hudspeth v. State, 849 Ark. 315, 322-23, 78 S.W.3d 99, 104 (2002). The open-fields doctrine applies to searches outside a property-owner’s home or curtilage, on land visible to others, where the owner has no expectation of privacy. Id., 78 S.W.3d at 104. It does not stand for the much broader proposition that an officer may detain and search a person simply because he happens to be standing in an open field. Third, we reject the State’s argument that Pickle had no reasonable expectation of privacy in his identity. Citing Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (stating that “in the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment”) and Fowler v. State, 2010 Ark. 431, at 2-4, 371 S.W.3d 677, 680-81 (stating that officers may ask an individual to approach their vehicle and give his name even absent reasonable suspicion), the State argues that because the game wardens’ initial stop produced no prejudicial information or evidence against Pickle other than his name, the Fourth Amendment and article 2, section 15 do not apply. However, the State’s reliance on Hiibel and Fowler is misplaced because both cases involved reasonable suspicion of a crime prior to law enforcement’s initial contact with the defendant. As discussed above, Rule 2.2 allows officers to request that a person voluntarily provide identification or answer questions. | ^However, neither case establishes the broader rule that police officers may demand an individual’s name or identification absent reasonable suspicion. As discussed above, a reasonable person in Pickle’s circumstances would not have believed himself to be free to refuse the game warden’s requests or terminate the encounter. Without reasonable suspicion, neither Hiibel nor Fowler provide authority for the game wardens’ detention and search of Pickle. Having established that none of the State’s preliminary arguments provide a basis to affirm, we turn to the key inquiry in this case: whether game wardens must have reasonable suspicion in order to legally conduct routine hunting-compliance checks. The State urges the Court to follow Louisiana, Minnesota, and Montana in holding that game wardens may routinely conduct warrantless, suspicionless hunting-compliance checks without violating the Fourth Amendment. See State v. McHugh, 630 So.2d 1259 (La.1994); State v. Colosimo, 669 N.W.2d 1 (Minn.2003); State v. Boyer, 308 Mont. 276, 42 P.3d 771 (2002). The circuit court adopted the rationale presented in these cases and found that, Hunters and fishermen who elect to participate in those specialized activities do so with the understanding that everything from the guns they may use, the ammunition they may use, the amount . and kind of waterfowl or fish they may kill or catch, the time when they may hunt or fish, and most everything else about their activity is regulated by the state. Therefore, the circuit court reasoned, hunters like Pickle have no reasonable expectation of privacy as to game wardens’ hunting-related inquiries. Alternatively, the circuit court stated that, even if a reduced expectation of privacy existed, the game wardens’ actions did not violate Pickle’s rights because the State’s interests in conducting routine hunting-compliance checks are Insufficiently compelling, they cannot be achieved through less restrictive means, and the intrusion on Pickle was slight. We cannot affirm the circuit court’s determination that reasonable suspicion is not required for routine hunting-compliance checks because both Arkansas and federal law are exceedingly clear that, in those rare instances in which reasonable suspicion is not required, a different sort of safeguard must be in place: the stop or search must be conducted under a plan of explicit, neutral limitations that prevent the officers from exercising unbridled discretion. Allen, 2013 Ark. 35, at 4, 425 S.W.3d at 757; Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (holding that “except in those situations in which there is at least articu-lable and reasonable suspicion ... stopping an automobile and detaining the driver in order to check his driver’s license and registration ... are unreasonable under the Fourth Amendment. This holding does not preclude the State ... from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion”) (emphasis added). The explicit, neutral limitations-test is a necessary second prong of analysis in cases where reasonable suspicion is not required. Allen, 2013 Ark. 35, at 4, 425 S.W.3d at 757; Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In Prouse, the United States Supreme Court struck down Delaware’s use of sus-picionless automobile “spot checks,” stating that “the ‘grave danger’ of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact.” Prouse, 440 U.S. at 662, 99 S.Ct. 1391. The Court specifically stated that, “given the alternative mechanisms available, both those in use and those that might be adopted,” such as permissible roadblock-style stops, Delaware’s use of standardless, unconstrained | mindividual vehicle stops unconstitutionally permitted officers to base such stops upon their own “unbridled discretion.” Id. In Allen, the Arkansas Supreme Court applied the explicit, neutral limitations-test to a suspicionless stop by a game warden, finding a Fourth Amendment violation because the game warden relied solely upon his own discretion rather than the type of explicit, neutral limitations required in Prouse. Allen, 2013 Ark. 35, at 4, 425 S.W.3d at 757. At the suppression hearing and on appeal, Pickle has repeatedly argued that exempting game wardens from the reasonable-suspicion requirement would allow unfettered discretion to make random stops based solely on the game warden’s will or discretion. Although the State referred to both Prouse and Allen throughout its brief, it never attempted to articulate the explicit, neutral limitations that apply to routine hunting-compliance checks. Despite the fact that the Arkansas Hunter’s Guidebook and relevant federal regulations were introduced at the hearing and both officers took the stand to testify, neither the State nor the circuit court specifically addressed whether current hunting laws and regulations, or possibly internal AGFC policies and procedures, provided the type of explicit, neutral limitations required by Prouse and Allen. The record is simply silent on this issue. In fact, this case presents the same problems that required suppression in Allen. In Allen, a game warden stopped a boat on Lake Hamilton in order to conduct a warrentless, suspicionless safety-compliance check for items such as life jackets. Allen, 2013 Ark. 35, at 1, 425 S.W.3d at 755. Although no violations had been observed before the stop, the game warden boarded the boat, conducted a search, determined that the operator had been drinking, and charged him with boating while intoxicated. Id., 425 S.W.3d at 755. The Arkansas Supreme |nCourt affirmed the circuit court’s decision to suppress the evidence because the game warden lacked any legal basis for the stop and search, and the stop was not pursuant to a plan that placed explicit, neutral limitations on the game warden’s conduct. 2013 Ark. 35, at 4, 425 S.W.3d at 757. For example, the court noted that the game warden tried to stop as many vessels as he could during each shift, but there were no explicit, neutral criteria for determining which boats to stop. Id., 425 S.W.3d at 757. Here, the game wardens also testified that they attempted to conduct as many hunting-compliance checks as possible, but there is no evidence to suggest that anything other than their own unbridled discretion determined who would be stopped. Likewise, the game wardens in this case appear to have gone beyond the scope of a routine hunting-compliance check when they chose to run an outstanding-warrants check on Pickle and discovered that he was a convicted felon. Officer Aston testified that it was his own personal protocol to run such a check when a hunter did not have his hunting license in his physical possession. The record is silent on whether the warrants check was part of any explicit plan or policy governing the conduct of AGFC officers, or whether the game wardens in this case were doing exactly what the Allen and Prouse courts feared: exercising unbridled discretion. Because the circuit court’s order denying Pickle’s motion to suppress fails to address a necessary prong of analysis, we hold that the decision was against the preponderance of the evidence. Without a finding that the game wardens acted pursuant to a sufficient plan of explicit, neutral limitations, we must hold that the stop and search violated Pickle’s rights under the | ^Fourth Amendment and article 2, section 15. Accordingly, we reverse the circuit court’s denial of Pickle’s motion to suppress. Reversed and remanded. Pittman, Wynne, and Whiteaker, JJ., agree. Gruber and Brown, JJ., concur. Gladwin, C.J., and Walmsley and Glover, JJ., dissent.