Cite as 2015 Ark. 286

# SUPREME COURT OF ARKANSAS

No. CR–15–3

| | | |
|---|---|---|
| | | Opinion Delivered June 25, 2015 |
| JIMMY PAUL PICKLE | APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. CR–2013-115] |
| V. | | |
| | | HONORABLE CINDY THYER, JUDGE |
| STATE OF ARKANSAS | APPELLEE | REVERSED AND REMANDED; COURT OF APPEALS OPINION VACATED. |

**JOSEPHINE LINKER HART, Associate Justice**

Appellant, Jimmy Paul Pickle, entered a conditional guilty plea and appealed from the circuit court's denial of his motion to suppress, arguing that two Arkansas Game and Fish Commission officers violated his right to be free from unreasonable searches and seizures as provided under the Fourth Amendment to the Constitution of the United States and article 2, section 15, of the Arkansas Constitution. The Arkansas Court of Appeals reversed the circuit court's decision. *Pickle v. State*, 2014 Ark. App. 726, 453 S.W.3d 157. We granted the State's petition for review, and we treat the appeal as if it had been originally filed in this court. *Fowler v. State*, 2010 Ark. 431, 1, 371 S.W.3d 677, 679. We reverse the circuit court's decision.

In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for

SLIP OPINION

clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court. *See, e.g.*, *Malone v. State*, 364 Ark. 256, 262, 217 S.W.3d 810, 814 (2005). Pickle does not dispute the facts presented by the State at the suppression hearing. At the hearing, Sergeant Brian Aston, a law-enforcement officer with the Arkansas Game and Fish Commission, testified that on November 18, 2012, he and another officer, Jeff McMullin, came into contact with Pickle and his duck-hunting party while the officers were working a section of the Cache River.

According to Aston, the officers made their way to within fifty yards of Pickle's duck-hunting party and observed them for approximately two hours. Aston admitted that during the two hours that he observed Pickle's hunting party, he did not see any hunting violations. He and McMullin decided to make contact with them and check for compliance with state and federal regulations pertaining to the harvest of waterfowl. In order not to be observed, they maneuvered to a point where the Cache River met an oxbow lake. McMullin used binoculars to "maintain a visual" to ensure that the hunting party did not hide or discard any waterfowl or other items while he attempted to approach. Aston recalled that the grass was waist high and that he was able to "belly crawl" to a point where he was in thicker cover. When he got to within sight of Pickle's hunting party, he identified himself as a game warden and signaled for McMullin to join him.

Pickle's hunting party consisted of three individuals. At the time Aston made contact with them, however, they were preparing to eat breakfast, and their guns were leaning against trees. The parties' guns were then inspected for compliance with federal hunting regulations,

and Pickle's gun was found to be in compliance. During the inspection, which lasted for twenty to twenty-five minutes, Aston looked inside any bags, opening them up to inspect their contents. According to Aston, after writing a citation for one member of the party, he stepped away, telling the hunting party to "have a safe day." McMullin told Aston that Pickle had said that he had left his license in his truck. "For officer's safety reasons," they stepped back to a point where they could not be observed by the hunting party and made a telephone call to Little Rock dispatch. Aston ran a "10-26 Hunting and Fishing License check" and confirmed that Pickle's license was valid. He also ran a "10-51 check through NCIC" to find out if Pickle had any outstanding warrants. According to Aston, it was his "personal protocol" to run a hunting-license check and a warrant check when a hunter does not have a hunting license on his person. He further stated that he would not have done so if Pickle had a hunting license on his person. He was advised that Pickle was a convicted felon. The officers made their way back to Pickle and arrested Pickle for being a felon in possession of a firearm. When he searched Pickle, he found on Pickle's person a small quantity of methamphetamine and a glass pipe. He turned Pickle over to the custody of a deputy sheriff from Craighead County.

In denying Pickle's motion to suppress, the circuit court found that Pickle did not have a reasonable expectation of privacy because he was engaged in the "highly regulated activity of hunting waterfowl." The court also found that Arkansas's "compelling interest in preserving the wildlife of the State of Arkansas and regulating its exploitation for the benefit of all citizens" weighed in favor of allowing the warrantless searches and seizures by game wardens because "the State's compelling and special objectives cannot be achieved through means

3

SLIP OPINION

significantly less restrictive of privacy freedoms and that the intrusion upon the defendant was slight." Relying chiefly on *Delaware v. Prouse*, 440 U.S. 648 (1979), our decision in *State v. Allen*, 2013 Ark. 35, 425 S.W.3d 753, and Rule 3.1 of the Arkansas Rules of Criminal Procedure, Pickle argues on appeal that he was unlawfully detained and unlawfully searched in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law.

In *Prouse*, the United States Supreme Court held that the practice of police officers making random stops of vehicles to check driver's licenses and vehicle registrations was unreasonable under the Fourth Amendment. The Court noted that the Fourth Amendment imposes a standard of reasonableness upon the exercise of discretion by government officials to safeguard the privacy and security of individuals against arbitrary invasions. *Id.* at 653–54. The Court observed that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 654. The Court concluded that in "those situations in which the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." *Id.* at 654–55 (citations omitted)(internal quotation marks omitted). While the Court noted that there are certain "relatively unique circumstances in which consent to regulatory restrictions is presumptively concurrent with participation in the regulated enterprise. . . . [R]egulatory

4

inspections unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified neutral criteria. *Id.* at 662 (citations omitted)(internal quotation marks omitted).

It was concluded in a short concurring opinion that

I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Prouse*, 440 U.S. at 664 (Blackmun, J., concurring).

The record was not sufficiently developed to indicate whether there were previously specified neutral criteria by which the officers' conduct could be deemed to have been conducted pursuant to a regulatory inspection that did not need to be accompanied by any quantum of individualized, articulable suspicion. This case may rightly be compared to our decision in *Allen*, where this court affirmed the circuit court's decision to suppress the evidence found after a game warden stopped, boarded, and searched a boat on Lake Hamilton, even though no violations had been observed before the stop. We observed that "this means that whether the stop is proper depends only on the law-enforcement officer's subjective assertion of his or her purpose when the Fourth Amendment requires objective facts supporting the stop or a plan embodying explicit, neutral limitations." *Allen*, 2013 Ark. 35, at 5, 425 S.W.3d at 757. In the present matter, the record was not developed.

Nevertheless, we need not decide whether the officer's investigation of Pickle to check for compliance with state and federal regulations pertaining to the harvest of waterfowl was

5

unreasonable. Pickle cites to Arkansas Rule of Criminal Procedure. 3.1, which provides as follows:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

Even assuming, but not deciding, that it was appropriate for the officers to conduct a search absent a reasonable, articuable suspicion, the evidence used to charge Pickle of possession of a firearm, possession of a controlled substance, and possession of drug paraphernalia, was adduced by the officers after they had completed any inquiry into Pickle's compliance with state and federal regulations pertaining to the harvest of waterfowl. In fact, Aston admitted that it was his "personal protocol" to conduct a warrant check. Thus, Aston's exploration of Pickle's criminal past and the subsequent search of his person went far beyond the scope of any administrative search conducted for the purpose of investigating Pickle's compliance with hunting laws. *See State v. Baldwin*, 475 A.2d 522 (N.H. 1984) (holding that even if fish and game officers had requisite power to conduct road check to determine compliance with fish and game laws, questioning driver about whether she had any weapons clearly exceeded scope of any permissible road check to determine compliance with fish and game laws). In this sense, the case is similar to those in which we have observed that an officer's continued detention of a motorist's vehicle after the legitimate purpose for the initial traffic stop has terminated

6

requires the officer to possess reasonable suspicion that the person is committing, has committed, or is about to commit a felony or a misdemeanor involving danger to persons or property, as the officer must develop reasonable suspicion to detain before the legitimate purpose of the traffic stop has ended. *Lilley v. State*, 362 Ark. 436, 208 S.W.3d 785 (2005).

Pickle has argued on appeal that he was unlawfully detained and unlawfully searched in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law. Here, even assuming that the officers properly conducted an investigation into Pickle's compliance with hunting laws, that investigation had concluded. Nevertheless, the officers began a criminal investigation, seeking information to determine whether Pickle was felon, a matter unrelated to Pickle's compliance with hunting laws, and on discovering that he was a felon, returned to the area and arrested and searched Pickle. On these facts, we cannot say that, prior to the completion of their investigation into Pickle's compliance with hunting laws, the officers developed reasonable suspicion that Pickle had committed a crime. Thus, we agree with Pickle's argument and hold that, on our de novo review based on the totality of the circumstances, the facts presented in this case did not give rise to reasonable suspicion allowing officers to conduct a criminal investigation.

Reversed and remanded; court of appeals opinion vacated.

HANNAH, C.J. concurs.

GOODSON, J., and Special Justice TERRY W. POOL concur in part and dissent in part.

7

SLIP OPINION

DANIELSON, J., dissents.

WYNNE, J., not participating.

**COURTNEY HUDSON GOODSON, JUSTICE, concurring in part and dissenting in part.** I would affirm the decision of the Craighead County Circuit Court denying the motion to suppress submitted by appellant Jimmy Paul Pickle.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law-enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions. *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979). In most cases, the police must possess probable cause for a seizure to be considered reasonable. *Dunaway v. New York*, 442 U.S. 200 (1979). However, the reasonableness of seizures that are less intrusive than traditional arrest can depend on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law-enforcement officers. *Brown v. Texas*, 443 U.S. 47 (1979).

I concur in the dissent's analysis that the balancing test in this case tips in favor of permitting wildlife officers to conduct brief compliance checks limited to those persons who they reasonably suspect are hunting or fishing and those who they reasonably suspect have recently been engaging in those endeavors. The State has great interest in protecting and

conserving wildlife within our borders, and the nature of the intrusion occasioned by a brief compliance check is slight in comparison. I also agree that hunting and fishing are highly regulated activities that result in a diminished expectation of privacy. Without exception, each state court that has confronted this issue has rejected Fourth Amendment challenges to the authority of wildlife officers to briefly detain persons for the purpose of conducting compliance checks. *People v. Maikhio*, 253 P.3d 247 (Cal. 2011); *State v. McHugh*, 630 So. 2d 1259 (La. 1994); *State v. Colosimo*, 669 N.W.2d 1 (Minn. 2003); *State v. Boyer*, 42 P.3d 771 (Mont. 2002); *State v. Halverson*, 277 N.W.2d 723 (S.D. 1979); *Elzey v. State*, 519 S.E.2d 751 (Ga. Ct. App. 1999); *People v. Layton*, 552 N.E.2d 1280 (Ill. Ct. App. 1990). Justice Blackmun's concurring opinion in *Prouse*, *supra*, which was joined by Justice Powell, also supports the conclusion that a compliance check conducted by a wildlife officer passes muster under the balancing process.

Unlike the dissent, I understand the basis for the majority's decision. In Arkansas, game wardens are full-fledged law-enforcement officers. Therefore, I am in agreement with the majority's conclusion that the strictures of the Fourth Amendment apply when a game warden sheds his role as a wildlife officer and commences to perform functions associated with being a law-enforcement officer that have nothing to do with the enforcement of game and fish regulations. However, I cannot agree with the majority's holding that, in this instance, the officers transgressed the Fourth Amendment by running an NCIC check. This is so for the simple reason that such checks are not searches or seizures within the meaning of the Fourth

Amendment. On this matter of law, I am persuaded by the opinion of the New Jersey Supreme Court in *State v. Sloan*, 939 A.2d 796 (N.J. 2008). There, the court held that, because the NCIC database is comprised of matters of public record, the defendant had no reasonable expectation of privacy in the records maintained in the database. Consequently, the *Sloan* court reasoned that the check was not a search and that the police officer did not need reasonable and articulable suspicion of criminal activity to access the database. *See also State v. Soukharith*, 570 N.W.2d 344 (Neb. 1997) (holding that an NCIC check is not a seizure within the meaning of the Fourth Amendment and need not be supported by reasonable suspicion).

As applied here, the officers completed the compliance inspection, concluded their conversation with the hunting party, and left the camp site. It was only after physically removing themselves from the camp site and the presence of the hunting party that the officers subsequently ran the NCIC check. Thus, it is clear that the officers were not detaining Pickle at the time they conducted the check. Importantly, the mere act of running an NCIC check was neither a search nor a seizure, and the information received afforded the officers reasonable cause to believe that Pickle was violating the law by being a felon in possession of a firearm. As a result, under Rule 4.1 of the Arkansas Rules of Criminal Procedure, the officers had the authority to arrest Pickle, and they were also permitted by Rule 12.1 to conduct a search of Pickle's person as incident to the lawful arrest. Accordingly, I cannot agree with the majority's

reversal of the circuit court's decision to deny the motion to suppress.[1]

I am authorized to state that Special Justice TERRY W. POOL joins this opinion.

---

[1]I consider the propriety of the officers' conduct in running the NCIC check as an issue that is properly considered on appeal. Pickle raised and developed this issue below in his argument that the officers illegally detained him for a second time after obtaining the results of the NCIC check. This court can affirm the circuit court if it reached the right result albeit for a different reason. *Green v. State*, 2015 Ark. 25, 453 S.W.3d 677.

# SUPREME COURT OF ARKANSAS

No. CR-15-3

| | |
|---|---|
| JIMMY PAUL PICKLE | Opinion Delivered June 25, 2015 |
| APPELLANT | |
| V. | |
| STATE OF ARKANSAS | |
| APPELLEE | DISSENTING OPINION. |

**PAUL E. DANIELSON, Associate Justice**

Because I believe the majority has erroneously reversed the circuit court's denial of Appellant Jimmy Paul Pickle's motion to suppress, I must dissent.

At the outset, I must note that the majority goes well beyond the scope of the actual issue on appeal in order to reverse the circuit court. The sole point raised by Pickle on appeal is whether "game wardens are subject to the same legal standards as all other law enforcement officers are bound to follow before detaining a citizen while engaged in a hunting activity." Pickle argues that game wardens may not arbitrarily stop hunters in the absence of any probable cause or reasonable suspicion that a crime has been committed or that criminal activity is afoot and cites to the court's decision in *State v. Allen*, 2013 Ark. 35, 425 S.W.3d 753, for support. In other words, according to Pickle, it was a violation of his constitutional rights for the officers to approach him and his hunting party to check their licenses, weapons, or any game they may have killed. After reading the majority opinion, I have no idea

whether game wardens are allowed to conduct the routine compliance checks that I believe are necessary in order for them to carry out their official duties. Thus, because I am not entirely sure what the majority is actually holding, I will simply set forth what I believe is the appropriate analysis of Pickle's argument on appeal.

I simply cannot accept Pickle's contention that Arkansas Game & Fish Commission ("AGFC") game wardens should not be allowed to approach hunters or perform safety or compliance checks in the absence of probable cause or reasonable suspicion. Pickle asserts that the State's claim that an intrusion is warranted because of the highly regulated nature of hunting can by equally applied to the activity of driving, which is also highly regulated, but his claim is not well-founded.

It is true that the Supreme Court held that a random investigative stop of a vehicle is impermissible. *See Delaware v. Prouse*, 440 U.S. 648 (1979) (holding that except in situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment). The Court balanced the permissibility of the law-enforcement intrusion on an individual's Fourth Amendment interest against its promotion of legitimate governmental interest, holding that because of the alternative mechanisms available for enforcing traffic and vehicle-safety regulations, the incremental

CR-15-3

contribution to the governmental interest of highway safety gained from the random spot checks did not justify the practice under the Fourth Amendment. *Id.*

When such a balance is considered in the instant scenario, the outcome is different. Yes, driving is a highly regulated activity. But, the nature of that activity lends itself to road blocks or check points that allow officers to check for impaired or unlicensed drivers or to check for insurance, as noted by the Court in *Prouse*. The activity of hunting does not lend itself to a streamlined type of compliance or safety check. There is simply not one way into the woods, and the game wardens can perform their job duties of regulating and managing the wildlife resources of this State only through random compliance checks with hunters. As Justice Blackmun noted in his concurrence in *Prouse*:

> The Court, ante, this page, carefully protects from the reach of its decision other less intrusive spot checks "that do not involve the unconstrained exercise of discretion." The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop. And I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Prouse*, 440 U.S. at 663–64 (Blackmun, J., concurring specially).

I simply cannot ignore the duties of game wardens and the manner in which those duties must be carried out. Amendment 35 to the Arkansas Constitution provides in relevant part as follows:

> The control, management, restoration, conservation and regulation of birds, fish, game and wildlife resources of the State, including hatcheries, sanctuaries, refuges,

reservations and all property now owned, or used for said purposes and the acquisition and establishment of same, the administration of the laws now and/or hereafter pertaining thereto, shall be vested in a Commission to be known as the Arkansas State Game and Fish Commission.

Ark. Const. amend. 35, § 1. And, the authority to "regulate bag limits and the manner of taking game and fish and fur-bearing animals" and to "fix penalties for violations" has been vested in the AGFC by amendment 35, § 8, and is codified at Arkansas Code Annotated § 15-41-203 (Repl. 2009). There are numerous AGFC guidelines related to the regulation of hunting and fishing, and the only way the AGFC can perform the duties related thereto is through compliance checks such as the one that occurred in this case. Thus, when the State's interests in regulating the activity of hunting and maintaining its wildlife resources are balanced against the minimal intrusion occasioned by a compliance check, it cannot be said that such checks violate hunters' constitutional rights.

A similar result was reached in *Elzey v. State*, 519 S.E.2d 751 (Ga. 1999), wherein the Georgia Court of Appeals addressed the very issue of whether wildlife officers have a right to approach hunters to check their hunting licenses and identification in the absence of probable cause or reasonable suspicion. In determining that such officers could legitimately approach hunters, the court noted that the wildlife officers' act of checking hunters was not analogous to that of a police officer conducting a roadblock. *Id.* The court reasoned that hunting in Georgia is a highly regulated activity that leads to a diminished expectation of privacy and cited the following notable language from a California appellate court decision:

[i]n analyzing the reasonableness of the search (inspection) and seizure (detention) of hunters, the special nature of hunting is significant. . . . [H]unting is a highly regulated

activity. The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except insofar as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good. The high degree of regulation over the privilege of hunting, in turn, reduces a hunter's reasonable expectation of privacy. . . . Given the highly regulated nature of hunting and the corresponding reduced expectation of privacy of hunters in their gear and their take from hunting, we find it is reasonable to detain hunters briefly, near hunting areas during hunting season, to inspect their licenses, tags, equipment, and any wildlife taken.

*Id.* at 754 (quoting *People v. Perez*, 59 Cal. Rptr. 2d 596, 601 (Cal. App. 3 Dist. 1996)) (citations and punctuation omitted). After discussing the holdings in *Perez* and other cases, the Georgia court announced that a wildlife officer may approach a hunter in a state-operated wildlife-management area to determine whether the hunter has the necessary license and permits and to ask him questions about his hunt, regardless of whether the officer has reason to suspect that the hunter has broken any laws. *Id.* In so ruling, the court also rejected any notion that the officers' actions were somehow less valid because they did not stop every hunter they saw. *Id.*

I believe that the Georgia court's approach is well reasoned and strikes a fair balance between an individual's rights under the Fourth Amendment and a state's need to manage and oversee its natural resources. I think a similar approach should be adopted by this court instead of adopting a rule of law that will totally hamstring the game wardens of this state. Therefore, I respectfully dissent.

*Miller Law Firm*, by: *Randel Miller*, for appellant.
*Leslie Rutledge*, Att'y Gen., by: *Kathryn Henry*, Ass't Att'y Gen., for appellee.
*James G. Goodhart, John P. Marks, Jennifer R. Jameson McKendree*, and *Christian N. Parks*, Arkansas Game and Fish Commission, amicus curiae for appellee.